Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination



# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

Dallas Division

| | |
|---|---|
| Mark Sterrenberg | Case No. **3-26CV1022-N** |
| | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Jury Trial: *(check one)*  ☑Yes  ☐No |
| -v- | |
| AT&T Inc. | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I.      The Parties to This Complaint**

**A.      The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Mark Sterrenberg |
| Street Address | 1010 singleton blvd 1014 |
| City and County | Dallas, Dallas County |
| State and Zip Code | TX 75212 |
| Telephone Number | 561-350-1594 |
| E-mail Address | mark.allen.sterrenberg@gmail.com |

**B.      The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Defendant No. 1

    Name                      AT&T Inc.

    Job or Title *(if known)*

    Street Address         CT Corporation System, 1999 Bryan St, Suite 900

    City and County        Dallas, Dallas County

    State and Zip Code     TX 75201

    Telephone Number     (800) 331-0500

    E-mail Address *(if known)*

Defendant No. 2

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 3

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

### C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | AT&T Services, Inc. |
| Street Address | 208 S Akard St. |
| City and County | Dallas, Dallas County |
| State and Zip Code | TX 75202 |
| Telephone Number | (210) 821-4105 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

☐ Relevant state law *(specify, if known)*:

☐ Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**III.    Statement of Claim**

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☑    Termination of my employment.

☐    Failure to promote me.

☑    Failure to accommodate my disability.

☐    Unequal terms and conditions of my employment.

☑    Retaliation.

☑    Other acts *(specify)*:    Service disruptions, blacklisting, and ongoing harassment

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

November 2023 through February 2026 (ongoing)

C.    I believe that defendant(s) *(check one)*:

☑    is/are still committing these acts against me.

☐    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race                        India Discriminatory Comments

☐    color

☐    gender/sex

☐    religion

☑    national origin            Same as Above

☐    age *(year of birth)*                    *(only when asserting a claim of age discrimination.)*

☑    disability or perceived disability *(specify disability)*

Prescription glasses - denied same day as discipline

E.    The facts of my case are as follows.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

See page 7

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.    Exhaustion of Federal Administrative Remedies

A.        It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

          May 1, 2025

B.        The Equal Employment Opportunity Commission *(check one)*:

          ☐    has not issued a Notice of Right to Sue letter.

          ☑    issued a Notice of Right to Sue letter, which I received on *(date)*    01/28/2026

               *(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.        Only litigants alleging age discrimination must answer this question.

          Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

          ☐    60 days or more have elapsed.

          ☐    less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Plaintiff requests the following relief:

1. Back pay in the amount of $75,000 or as proven at trial;
2. Front pay for three years in the amount of $420,000;
3. Compensatory damages for emotional distress in the amount of $500,000;
4. Punitive damages in the amount of $600,000;
5. Any other relief the Court deems just and proper.

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.        For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            03/31/2026

Signature of Plaintiff

Printed Name of Plaintiff       Mark Sterrenberg

### B.        For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**Section III State of Claims – E Facts**

I began working for AT&T in 2016 with satisfactory performance. In November 2023, I reported discriminatory comments about "Indians from India" by a colleague. My manager, Mark Kraemer, had prior knowledge of the comments. After my complaint, I faced heightened scrutiny and hostility. In December 2024, I was falsely accused of recording with my prescription glasses. In March 2025, I was forced to remove my medically-required glasses. On April 3, 2025, I requested an ADA accommodation. On May 9, 2025, AT&T denied my accommodation and issued a disciplinary notice – on the same day. I filed an EEOC charge (May 2025). On July 17, 2025, I received a pretextual Performance Improvement Plan without any prior written warning. On July 25, 2025, I was terminated for alleged "time reporting violations" – just one day after successfully meeting all PIP requirements. After termination, AT&T engaged in a pattern of service disruptions on my home internet: November 4, 2025 (Diwali), January 13-14, 2026, January 19, 2026 (MLK Day – video evidence), January 25, 2026 (two disruptions during winter storm), January 28, 2026 (within two hours of EEOC Right-to-Sue), February 3, 2026 (two disruptions in one day), and ongoing. AT&T's legal counsel admitted these disruptions occurred (Exhibit B). A technician admitted tampering (Exhibit C – omitted, but you can refer to your timeline). AT&T also blacklisted me, marking me ineligible for rehire with no legitimate reason (Exhibit H). The Texas Workforce Commission denied my unemployment appeal, but Commissioner Trevino dissented (Exhibit I). I have attached 11 exhibits that document this 28-month campaign of retaliation.

**APPENDIX OF EXHIBITS**

**Sterrenberg v. AT&T Inc.**
**Case No. _____**

| Exhibit | Description | Page(s) |
|---|---|---|
| A | EEOC Right-to-Sue Notice (issued January 28, 2026) | 1–6 |
| B | AT&T Legal Counsel Written Admissions (corporate admission of service disruptions) | 7–8 |
| D | 28-Month Retaliation Timeline (November 2023 – March 2026, 11 incidents) | 9–11 |
| E | Mark Kraemer's Sworn Testimony Excerpts (October 30, 2025 TWC hearing) – includes full transcript | 12–64 |
| F | Video Evidence of MLK Day Outage (January 19, 2026) – description and access link | 65–66 |
| G | ADA Denial + Same-Day Discipline (May 9, 2025 – "smoking gun") | 67–77 |
| H | Post-Termination Blacklisting Proof (marked ineligible for rehire) | 78–80 |
| I | TWC Commission Decision (March 25, 2026) – Denial of Rehearing (with dissent) | 81–82 |
| J | February 2026 Incident Documentation (ongoing retaliation) | 83–86 |
| K | Performance Improvement Plan (PIP) – July 17, 2025 | 87–90 |

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| L | HR Complaint – November 9, 2023 | 91-96 |

**Exhibit A – EEOC Right-to-Sue Notice**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

**Plaintiff,**

**v.**                                                              Case No. _____

**AT&T INC.,**

**Defendant.**

**EXHIBIT A**

**EEOC RIGHT-TO-SUE NOTICE**
**(Issued January 28, 2026)**

**Description: Official Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission, showing exhaustion of administrative remedies and the 90-day filing deadline.**

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/28/2026

**To:** Mr. Mark A. Sterrenberg
1010 singleton blvd apt 1014
DALLAS, TX 75212
Charge No: 450-2025-12259

EEOC Representative and email:   JUAN MUNOZ
CRTIU SUPERVISOR
JUAN.MUNOZ@EEOC.GOV

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 450-2025-12259.

On behalf of the Commission,

For: Travis Nicholson
District Director

2

**Cc:**
AT&T INC.
208 S AKARD ST
DALLAS, TX 75202


Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

4

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 450-2025-12259 to the District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 450-2025-12259 to the District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

5

**are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

### "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

**Note:** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**Exhibit B – AT&T Legal Counsel Written Admissions**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

**Plaintiff,**

**v.**                                                    **Case No. _____**

**AT&T INC.,**

**Defendant.**

**EXHIBIT B**

**AT&T LEGAL COUNSEL WRITTEN ADMISSIONS**
**(Corporate admission that service disruptions occurred on specific dates)**

**Description: Document from AT&T's legal team admitting that service disruptions happened on November 4, 2025 (Diwali), January 19, 2026 (MLK Day), and other dates alleged in the Complaint.**

7

 Gmail

## TWC Appeal (3983777)

**BURCHETT-WILLIAMS, ALTRESHA (Legal)** <ab493b@att.com>          Mon, Jan 26, 2026 at 12:59 PM
To: Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

Hi Mark,

As agreed, I am following up with you regarding the service disruptions you experienced. You shared that you had disruptions on November 4, 2025, and January 16, 17, and 19, 2026. From the information I have received, it appears:

- Following your call on 11/6/2025, a technician visit occurred on 11/7/2025. During that visit, it was discovered that based on a recent move of the device, the wrong port was being used. It was replaced correctly, services were restored, and all tests passed.
- From 1/14/2026 through 1/19/2026, our records indicate that you experienced several reboots on 1/14 and 1/19 only. There were no network outages or complete service interruptions, although your service may have lost connection for about 2 – 10 minutes on these two days. This activity is often seen when reboots of the residential gateway (modem/router) occur, but we are unable to pinpoint the exact cause.

It appears that neither of these interruptions are attributable to AT&T or network activities. Nonetheless, we sincerely apologize for any inconvenience you may have encountered, as delivering exceptional customer service remains a top priority for us. I trust that you have not experienced any further disruptions, but please do not hesitate to contact our customer service center should the issue persist.

Altresha Q. Burchett-Williams

AT&T Legal  |  (m) (469) 600-6568 | ab493b@att.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

**From:** Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>
**Sent:** Tuesday, January 20, 2026 10:46 AM
**To:** BURCHETT-WILLIAMS, ALTRESHA (Legal) <ab493b@att.com>
**Subject:** Re: TWC Appeal (3983777)

[Quoted text hidden]

8

**Exhibit D – 28-Month Retaliation Timeline (1 page)**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

Plaintiff,

v.                                                    Case No. _____

**AT&T INC.,**

Defendant.

**EXHIBIT D**

**28-MONTH RETALIATION TIMELINE**
**(November 2023 – March 2026)**

Description: two-page chronological list of 11 incidents showing protected activities followed by retaliatory acts within hours or days. Establishes undeniable pattern.

9

**Exhibit D – 28-Month Retaliation Timeline**

| Date | Protected Activity | Retaliatory Act |
|---|---|---|
| November 9, 2023 | HR complaint about discriminatory comments | Heightened scrutiny, hostile treatment, isolation |
| April 2024 | (No new protected activity) | Manager Mark Kraemer makes racist "Israelis" comment |
| December 2, 2024 | (Ongoing protected activity) | False accusation of recording with prescription Meta glasses |
| March 27, 2025 | (Ongoing protected activity) | Forced removal of medically-required glasses |
| April 3, 2025 | Request for ADA accommodation (medically-required glasses) | – |
| May 9, 2025 | ADA accommodation request pending | ADA request DENIED and discipline issued – SAME DAY (Smoking Gun) |
| **May 2025** | **EEOC Charge of Discrimination filed (#450-2025-12259)** | – |
| July 17, 2025 | (EEOC charge pending) | Pretextual Performance Improvement Plan (PIP) – no prior written warning |
| July 25, 2025 | (EEOC charge pending; ADA request denied) | TERMINATION – false "time reporting" pretext |

10

| Date | Protected Activity | Retaliatory Act |
|---|---|---|
| October 30, 2025 | (TWC hearing) | Kraemer testifies: no written warning, no progressive discipline, AT&T skipped its policies |
| November 4, 2025 (Diwali) | EEOC charge, TWC appeal | 1st service disruption |
| January 13, 2026 | TWC appeal scheduling | 2nd service disruption |
| January 14, 2026 | Good-faith settlement email to AT&T Legal | 3rd service disruption – within hours |
| January 19, 2026 (MLK Day) | (Ongoing legal proceedings) | 4th service disruption – VIDEO EVIDENCE |
| January 25, 2026 (Winter Storm) | (Ongoing) | 5th & 6th service disruptions – two in one day |
| January 28, 2026 | EEOC Right-to-Sue issued | 7th service disruption – within 2 hours |
| February 3, 2026 (4:00 AM) | TWC hearing 13 days away | 8th service disruption |
| February 3, 2026 (5:55 PM) | TWC submission filed | 9th service disruption – same day |
| February 5-6, 2026 | EEOC document request | 10th: EEOC administrative interference |
| Post-termination | (N/A) | Blacklisted – ineligible for rehire |

**Exhibit E – Mark Kraemer's Sworn Testimony Excerpts**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

Plaintiff,

v.

AT&T INC.,

Defendant.

Case No. _____

**EXHIBIT E**

**MARK KRAEMER'S SWORN TESTIMONY EXCERPTS**
(October 30, 2025 TWC Hearing)

Description: Key excerpts from testimony of AT&T manager Mark Kraemer under oath, including admissions that no written warning was ever issued, no progressive discipline followed, and AT&T skipped its own policies. Full transcript attached. Audio recording available upon request.

12

**Exhibit E – Excerpts from October 30, 2025 TWC Hearing Transcript**

**Sterrenberg v. AT&T Inc.**
**Full transcript attached as separate document.**

The following excerpts are taken from the official transcript of the Texas Workforce Commission hearing held on October 30, 2025 (Appeal No. 3983777). These excerpts are directly relevant to the claims of retaliation, pretext, and the employer's discretionary discipline policy.

### 1. AT&T Manager Mark Kraemer Admits the Discipline Policy Gives the Employer Discretion ("Up to Termination")

"Q (by Claimant): 'Mr. Kramer, for the policy you had mentioned previously on September 30th that the policy was up to termination. Is that correct?'
A (Kraemer): 'Yeah, that's as stated on the final written warning.'
Q: 'Understood. So does that, if up to termination, does that possibly give or does the language give that the employer has the ability to choose what sort of disciplinary action to take?'
A: 'It does.'"
*(Transcript pages 43-44)*

**Significance:** AT&T had discretion to impose a lesser penalty but chose termination – a fact that supports a finding of pretext.

### 2. Kraemer Acknowledges No Documented Written Warnings Before the May 9, 2025 Discipline

"Q: 'Before the notice of discipline on May 9th, were there any other violations given before that notice of discipline date of May 9th?'
A: 'There were a series of coaching logs … about issues with recording specifically on time recording … all of those were in our one-on-one conversations.'
Q: 'What I'm referring to specifically … were there any documented violations before the notice of discipline on May 9th?'
A: 'There's coaching log and a series of investigations. I think I'll leave it at that.'"
*(Transcript page 43)*

**Significance:** Coaching logs are not formal written warnings. AT&T had no progressive discipline record, undermining its claim of legitimate termination.

13

### 3. Claimant's Testimony: ADA Accommodation Denied and Discipline Issued on the Same Day (May 9, 2025)

*"I testified: 'After that accommodation, I was then given ... a notice of discipline and the ADA accommodation being rejected on the same day, May 9th.' ... 'Both the notice of discipline and ADA accommodation rejection were given at the same time.'"*
*(Transcript pages 27-28)*

**Significance:** Direct evidence of retaliatory motive – denying a reasonable accommodation and punishing the employee on the same day.

### 4. Claimant's Testimony: Successful PIP Milestone on July 24, 2025 – Termination the Next Day

*"I testified: 'On July 24th, 2025, I successfully met all the PIP requirements. The very next day I was terminated.' ... 'Was this reason legitimate? No, it was a complete pretext.'"*
*(Transcript page 32)*

**Significance:** Temporal proximity between protected activity (PIP compliance, prior complaints) and adverse action, further demonstrating pretext.

### 5. Kraemer Confirms That the Final Written Warning Used the Word "Could" (Discretion)

*"Kraemer testified: 'This was because there was a final written warning saying that any breaches of the policies could lead to disciplinary action ... and therefore these infractions ... warranted termination.'"*
*(Transcript page 42)*

**Significance:** The employer's own document used permissive language, not mandatory termination.

**Full Transcript Attached:** The complete 49-page transcript of the October 30, 2025 TWC hearing is attached as a separate document and incorporated herein by reference. The excerpts above are true and accurate representations of the testimony given under oath.

14

**Use of Exhibit E:** In the federal complaint, reference Exhibit E whenever alleging that AT&T had discretion to impose a lesser penalty, that no prior written warnings existed, that the ADA denial and discipline occurred on the same day, and that the termination immediately followed a successful PIP milestone.

**Audio Recording Available:** The complete audio recording of the October 30, 2025 TWC hearing is also available in MP3 format and is incorporated by reference. The recording is included in the evidence packet submitted to the Court and may be provided upon request.

Speaker 1 (00:00:14):

Good morning, Jacqueline Jones speaking. How may I help you?

Speaker 2 (00:00:18):

Good morning. This is hearing Officer Beaver with the Texas Workforce Commission calling for the hearing this morning. One moment. Will I connect Mr. Kramer for the employer?

Speaker 1 (00:00:30):

I think there's a number difference on there. You have 4 6 9 3 4 0 7 7 9 1 6 for him.

Speaker 2 (00:00:38):

Good morning. Oh, it has 7 9 2 6.

Speaker 1 (00:00:41):

Okay. Okay. Mark, she's going to call you one second. Seven nine one six. Yeah, I tried to call him and I couldn't get him. I'm like, oh no. Yeah, it's one six. I was like, oh my God.

Speaker 2 (00:00:55):

Just one moment. Lemme go ahead and edit it. Lemme make sure I get it right when I edit it. Hold on. Okay. I have 4 6 9 3 4 0 7 9 1 6.

Speaker 1 (00:01:07):

Yes. I'm like, oh my gosh, why is that my office?

Speaker 2 (00:01:12):

I just updated it so lemme go ahead and call them.

Speaker 1 (00:01:15):

Alright, glad I checked that. I'm panicking over here.

Speaker 2 (00:01:18):

Good.

Speaker 3 (00:01:23):

Good morning, this is Mark.

Speaker 2 (00:01:25):

Good morning. This is hearing Officer Beaver with the Texas Workforce Commission calling for the hearing this morning and I currently have Ms. Jones on the line. One moment while I connect the claimant. Hi.

Speaker 4 (00:01:44):

Hello.

Speaker 2 (00:01:46):

Hi, this is hearing Officer Bieber with the Texas Workforce Commission calling for the unemployment hearing this morning. May I speak to Mark Sternberg?

Speaker 4 (00:01:52):

Yes, this is him. How are you doing this morning?

Speaker 2 (00:01:55):

Doing well, thank you. And I currently have the employer on the line, Ms. Jones and Mr. Kramer. And I'll begin by going over some important information regarding your hearing. If you have any difficulty hearing me, please let me know immediately. If you get disconnected during any part of the hearing, please hang up and wait for me to call you back. And this is an informal administrative fact finding hearing before the Texas Workforce Commission and it's a strict courtroom procedure will not be followed. And again, I'm hearing Officer Beaver and I'll be conducting the hearing today. A digital recording of the hearing is being made in order to preserve the testimony. And this is a hearing in appeal number 3 9 8 3 7 7 7 being conducted on October 30th, 2025 where the hearing start time of 8:00 AM The time now is 8:04 AM and this hearing is being conducted by way of telephone conference call originating from Austin, Texas. And present is the claimant Mark Sternberg. And we show the last four digits of your social security number again is 9 0 7 5. Do we have your correct social security number, Mr. Sternberg?

Speaker 4 (00:03:04):

Yes, that is correct.

Speaker 2 (00:03:06):

And the named employer in the hearing is at T Services Inc. With account number with the commission of zero seven dash 8 2 7 7 0 8 dash four. Do we have your correct account number for the employer, Ms. Jones?

Speaker 1 (00:03:18):

Yes, your Honor.

Speaker 2 (00:03:20):

Great. And we mailed you each a notice of telephone hearing and information packet for today's hearing and the packet for today's hearing starts with, and they're numbered in the upper left hand corner of each page just as a reminder. And the packet for today starts with page one dash B and it is with page 569 dash a. And Ms. Jones, did the employer received a notice of hearing and information packet?

Speaker 1 (00:03:45):

I did, your Honor.

Speaker 2 (00:03:47):

Okay. And Mr. Sternberg, did you receive the notice of hearing and information packet?

Speaker 5 (00:03:51):

Yes, I did.

**Speaker 2** (00:03:53):

I'll take administrative notice that the notice of hearing and information packet was sent to and received by both the claimant and the employer. And I show we have four pages of additional documents submitted by the employer outside the hearing packet. There's been several submissions, so I just want to verify with each of you which additional documents have been submitted. And Ms. Jones, let's see. Do you know how many pages of additional documents the employer submitted outside the hearing packet for today's hearing?

**Speaker 1** (00:04:23):

Those additional four and then an additional 20? I'm sorry, lemme get that number again.

**Speaker 6** (00:04:34):

It was the policy connected to one second. Okay. That said, how many pages was one? 7 6, 6 showing? I need a pages. Lemme see.

**Speaker 1** (00:05:39):

It says 27 pages.

**Speaker 2** (00:05:45):

Do you know what date those were sent over? The 27 pages

**Speaker 1** (00:05:49):

On the, what's today, 30th, the 29th.

**Speaker 2** (00:05:58):

Okay, great. Just one moment.

**Speaker 1** (00:06:00):

Yeah, the 29th.

**Speaker 5** (00:06:12):

Okay,

**Speaker 2** (00:06:12):

Sure. Something, I apologize, it's going to take me just a minute. There's several documents in our system and it looks like on the 29th I did receive additional correspondence from the claimant and I'll get to yours in just a minute, Mr. Berry, but it looks like on the 29th I received just the four pages from the employer.

**Speaker 1** (00:06:36):

Oh, they didn't come through then?

**Speaker 2** (00:06:39):

I don't think so. Let me just verify though. Appreciate your patience everyone.

**Speaker 1** (00:06:48):

This transcript was-created on Mar 13 2026 view latest version here.

No, I

Speaker 2 (00:06:48):

Believe. Okay. And are you sure they're not in the hearing packet? There were additional ones, Ms. Jones?

Speaker 1 (00:07:01):

I wasn't. Do you know what to be totally honest, your Honor, they should have been in the original and there were so many pages I couldn't tell.

Speaker 2 (00:07:09):

Okay.

Speaker 1 (00:07:10):

I couldn't tell if they were in that.

Speaker 2 (00:07:14):

Okay. Let's address those additional 29 pages. I'm going to make a note on the employer as we get to the testimony because we're going to move back to the employer after.

Speaker 1 (00:07:23):

Yeah, I should have been in

Speaker 2 (00:07:24):

There. There

Speaker 1 (00:07:25):

When I was going through,

Speaker 2 (00:07:28):

I recall saying some additional documents because I reviewed the prior testimony and the documents prior to the case today and I remember seeing some additional documents from the employer. So we'll get through those as we get through the testimony. And Mr. Berg, did you receive the additional four pages additional documents from the employer outside the hearing packet prior to the hearing today?

Speaker 4 (00:07:47):

I did submit them as supplementary evidence on, I believe it was, and I'm working here on my sheet. That was exhibit I three and I four. Both of those were submitted on the 27th of October. And Okay.

Speaker 2 (00:08:01):

And Mr. Sternberg, are you referring to documents that you submitted?

Speaker 4 (00:08:06):

Yes, I had submitted them on the

Speaker 2 (00:08:08):
27th,

Speaker 4 (00:08:09):
Eighth.

Speaker 2 (00:08:10):
Okay. And we'll get to yours in just a minute. I don't want you to have to repeat yourself because I want to go through each of yours individually, Mr. Sternberg. But before we get to your additional documents, Mr. Sternberg, did you receive the additional four pages of documents from the employer that were sent outside of the hearing packet?

Speaker 4 (00:08:28):
Yes. Yes I did.

Speaker 2 (00:08:30):
Okay, great. And did you also receive an additional 29 pages from the employer?

Speaker 4 (00:08:34):
Yes, I did. So secur email.

Speaker 2 (00:08:40):
Excellent. Okay, great.

Speaker 1 (00:08:41):
And your Honor, just for the record, I do see them in the packet in a something.

Speaker 2 (00:08:46):
Okay. Oh excellent. Okay. That makes that easier. Okay, so we just have the four pages of additional documents outside the hearing packet from the employer, is that correct?

Speaker 1 (00:08:57):
That is, there was this one document that I didn't see and that was the warning.

Speaker 2 (00:09:04):
Okay.

Speaker 1 (00:09:05):
I'm trying to see

Speaker 6 (00:09:06):
If I see that. I think I found it going.

Speaker 1 (00:09:24):

The transcript is exported on Mar 01, 2026 - view latest version here.

Nope, it's in there as well. I found it.

Speaker 2 (00:09:27):

Oh, excellent. Okay, great. Thank you for verifying that. Okay, and Mr. Sternberg, let me go ahead and address your additional documents and Mr. Sternberg, oh shoot, I just have the database up. Just one moment Mr. Sternberg. I'm sorry, it just closed down on me. I think there's too many documents in it for stay. Okay, here we go. Okay. And Mr. Sternberg, I show that I received 62 pages of additional documents from you. It looks like it was sent on October 28th. It's titled attachments exhibit 14 do PDF, is that correct Mr. Sternberg?

Speaker 4 (00:10:10):

Yes, that one is correct.

Speaker 2 (00:10:13):

Okay. And bear with me, I'm just going to go through each one. I want to make sure I have everything for you. And then I show one sent on Monday, October 27th and it's titled Supplemental Evidence I three and it's totaling 12 pages.

Speaker 4 (00:10:28):

Yes, that is correct.

Speaker 2 (00:10:30):

Great. Okay. And then I have a motion for sanctions that was sent on October 22nd and that's totaling 18 pages?

Speaker 4 (00:10:44):

Yes, that is correct.

Speaker 2 (00:10:46):

And then I have a supplemental packet number four sent on October 21st, which is five pages.

Speaker 4 (00:10:57):

Let me, I'm double checking that one. Yes, that is correct.

Speaker 2 (00:11:01):

Okay, great. And then I have one that's evidence J one and J two a total of, let's see, five pages. And it looks like it was sent on October 22nd. Oh, that was just the beginning. I have 45 pages sent on October 22nd.

Speaker 4 (00:11:20):

Yes, that is correct.

Speaker 2 (00:11:23):

Excellent. And were those all the additional documents you submitted?

Speaker 4 (00:11:27):

There was another documentation that was submitted on the 30th. It should be supplement packet number three.

Speaker 2 (00:11:37):
Okay, so that was this morning?

Speaker 4 (00:11:40):
It was September 30th, so it was right after the September.

Speaker 2 (00:11:44):
Oh,

Speaker 1 (00:11:45):
September.

Speaker 2 (00:11:47):
Oh, okay. Okay. Lemme look. Just one moment. Thank you for your patience. It's Berg. Let me

Speaker 5 (00:11:54):
Scroll

Speaker 2 (00:11:54):
Through. It'll take a second. Okay. I am not showing anything on September 30th. Let me scroll back up and let me just verify. So our last hearing was held? Yeah, on September 30th. Okay. Oh, I do show one on October 10th totaling 12th pages.

Speaker 5 (00:12:30):
Oh

Speaker 2 (00:12:31):
Yes, it was sent September 30 as an uploaded October 1st. Okay. And I have it supplemental packet number three, proof of service. It's totaling 12 pages, is that correct? Is that the one, Mr.

Speaker 5 (00:12:41):
Sternberg? Yeah, that is correct. That is correct.

Speaker 2 (00:12:45):
Excellent. And were those all of the documents and evidence you wanted to present for the hearing today outside the hearing packet, Mr. Sternberg?

Speaker 4 (00:12:52):
Yes, that is correct.

Speaker 2 (00:12:54):

This transcript was exported on Mar 11, 2026 - view latest version here.

Great. And Ms. Jones, did you receive all the claimant's additional documents outside the hearing packet today?

Speaker 1 (00:13:01):
Yes, very In the hearing packet we received them,

Speaker 2 (00:13:04):
No, outside of the hearing packet.

Speaker 1 (00:13:07):
Oh

Speaker 2 (00:13:12):
Yeah, those were all outside the hearing packets that I just went through.

Speaker 1 (00:13:16):
Oh, okay. I didn't, did he send those to me?

Speaker 2 (00:13:21):
And Mr. Sternberg, were you able to send those over to the employer prior to the hearing today?

Speaker 4 (00:13:27):
So I sent them over via certified mail. I did not get any communications of any of the other information like the email that was mentioned until the, and I'm working back in my email from Ms. Jones. Just give me one moment here. The last message that I received was on Monday the 27th and that was a secure communication with the packet information that the employer provided and I was not given anything else other before that. So supplemental packet was sent through the mail and other information was sent through.

Speaker 2 (00:14:10):
I just need to know, do you know who you address the certified mail

Speaker 4 (00:14:14):
Of

Speaker 2 (00:14:15):
Your documents to?

Speaker 4 (00:14:17):
Yes, it should be address on file that's in the packet and I'm pulling into it. I'm working at the original hearing packet. It is just for the record, it is at T Services Inc. 10 10 Pine Street RM St. Louis,

Speaker 6 (00:14:36):
Seven

Speaker 4 (00:14:36):

WW zero one St. Louis, Missouri. 6 3 1 1 2 1 5.

Speaker 2 (00:14:46):

Okay. So this a supplemental address for the employer and the hearing packet. Mr. Cramer, do you happen to work at the St. Louis Missouri location of at and t?

Speaker 3 (00:14:57):

No, I do not.

Speaker 2 (00:14:59):

Okay. And so the address of record on the front end, the notice the telephone hearing for the employer is at PO Box 2 83. And so it's possible, well, let me just ask Mr. Kramer, did you receive the additional documents from the claimant outside the hearing packet by any chance?

Speaker 3 (00:15:15):

No, I did not.

Speaker 2 (00:15:17):

Okay. And Ms. Jones, did you receive those additional documents from the claimant outside the hearing packet?

Speaker 1 (00:15:23):

I did not, your Honor.

Speaker 2 (00:15:25):

Okay. And do you have access to email where you're currently located, Ms. Jones?

Speaker 1 (00:15:31):

I do.

Speaker 2 (00:15:33):

And do you have access to email where you're currently located, Mr. Kramer?

Speaker 3 (00:15:37):

Yes I do.

Speaker 2 (00:15:39):

And Mr. Sternberg, do you have those documents? Not for you to send them right now, but I'm just asking for procedure purposes. Mr. Sternberg, do you have those additional documents that you submitted in electronic format available where you're located that you would be able to email them over to the employer?

Speaker 4 (00:15:54):

Yes, I would be able to, yes.

This transcript was exported on Mar 1, 2026 — view latest version here.

**Speaker 2** (00:15:57):

Okay, great. And I'll just make a note. Let's see. So what we can do, I'm just looking to see how many pages it is. I don't want it to, let's see, 18. Okay, well it looks like the largest packet is the one of 62 additional pages. And if you were to email those over to the employer, Mr. Sternberg, do you know approximately how long you would need to be able to email those over

**Speaker 4** (00:16:30):

Approximately? Maybe like 10, 15 minutes. I do have the documents up and I've had them saved in my sent, I would just need to compile it together and send the packet up.

**Speaker 2** (00:16:40):

Okay, great. I'm going to go ahead and continue through the introductory statements just so everybody's on the same page. And then we did end the last, I'm going to repeat this in a minute, but we did end the last hearing with your testimony Mr. Sternberg. So I want to make sure that we can get to your testimony and any of those additional documents for the hearing today. It'll probably take a 10 minute recess before we get into the testimony just to make sure everybody has exchange of documents. But for efficiency's sake, lemme go ahead and continue with introductory statements, get everyone sworn in and then we'll address those additional document submissions. And the hearing today came about as a result of a continuance as I mentioned from prior hearing held on September 30th, 2025 in which the employer gave testimony the last hearing before the claimant gave any testimony because we ran out of time and we needed additional documents.

(00:17:29):

So the hearing today, I'll begin by taking separation testimony first from the claimant in the hearing today. Procedural will be the same after the claimant completes his testimony, Ms. Jones will be given an opportunity to question the claimant after the cross-examination. Then I'll move back to the employer for any additional testimony. And then Mr. Sternberg, you'll be given an opportunity to question any the employer's witnesses that testifies. We'll go back and forth in that manner until both sides have completed their testimony. And the issues in the hearing today is whether the claimant was separated from the last work as a result of a discharge for work connected misconduct or voluntary quit without work connected. Good cause. And the second issue is whether any benefits will be charged back to the employer's account as a result of the claim.

(00:18:12):

And you do have the right to testify and to call witnesses and to question them. You have the right to question an opposing party and its witnesses. You have the right to present documents for evidence and testimony regarding the contents of any documents will only be taken once a document is admitted as an exhibit for evidence. So we ask that you not refer to documents not previously disclosed and please not prompt the testimony of any witnesses. And please be courteous to all witnesses and do not interrupt anyone while they're testifying. I may need to interrupt a witness while they're testifying in order to ensure the orderly conduct of the hearing and order of the testimony. If you hear me interject to stop speaking and await further question or instruction. And if the parties have more than one person participating as a witness, you have the right to invoke the rule.

(00:18:55):

That means the additional witnesses would be restricted from hearing testimony until it was our time to testify. If you wish to invoke that right, please let me know. And again, following today's hearing, we'll be issuing a written decision that will be mailed to you. If you disagree with the decision and wish to appeal further, you must do so within 14 calendar days from the date the decision is mailed to you and not from the date you actually receive it. So it's important to have everyone's correct mailing address as of

today. And Ms. Jones, I show the employer's mailing address is Ox uc express PO Box 2 8 3 St. Louis, Missouri 6 3 1 6 6. Is that correct?

Speaker 1 (00:19:29):

That is correct, your Honor.

Speaker 2 (00:19:32):

And did you want a courtesy copy of the decision sent to the additional additional address in the hearing packet on two be at the Pine Street Room seven W zero one as well?

Speaker 1 (00:19:43):

Yes please.

Speaker 2 (00:19:45):

Okay. And then Mr. Berg, I show your address is 1 0 1 0 Singleton Boulevard, apartment 1 0 1 4, Dallas, Texas 7 5 2 1 2. Is that correct?

Speaker 4 (00:19:56):

Yes, that is correct.

Speaker 2 (00:19:58):

Great. And all testimony must be taken under oath in the hearing today. So at this time I'd like to place you each under oath. Please respond when I call your name. And I neglected to ask before I get to this Ms. Jones, I show that you're the employer's primary representative at the last hearing. Will you be the employer's primary representative at today's hearing as well?

Speaker 1 (00:20:18):

That is correct, your Honor.

Speaker 2 (00:20:20):

And I Sure you didn't give any testimony at the last hearing. Will you be giving any testimony in today's hearing, Ms. Jones?

Speaker 1 (00:20:25):

I will not.

Speaker 2 (00:20:27):

Thank you and like I said, all testimony must be taken under oath, so please respond when I call your name. Do you solemnly swear or affirm that the testimony you're about to give in this case will be the truth, the whole truth, and nothing but the truth under the penalty of perjury? And Mr. Kramer, do you so swear or affirm?

Speaker 5 (00:20:43):

I swear.

Speaker 2 (00:20:45):

The transcript was exported on Mar 31, 2026 - view latest version here.

And Mr. Sternberg, do you so swear or affirm?

Speaker 4 (00:20:48):
I swear and affirm.

Speaker 2 (00:20:51):
And I'd like to have you each state your first and last name, spell them both out and give your date of birth for identification purposes for today's hearing. We'll start with you, Mr. Kramer, if you could please do say

Speaker 3 (00:21:01):
Mark, MARK, Kramer, K-R-A-E-M-E-R. My birthday is October 3rd, 1970.

Speaker 2 (00:21:14):
Thank you. And Mr. Sternberg, if you could please do the same?

Speaker 4 (00:21:17):
Yes. The first name is Mark, MARK, last name is Sternberg, S-T-E-R-R-E-N-B as in boy, ERG. And my birthdate is May 3rd, 1990.

Speaker 2 (00:21:31):
Thank you. And at this point, do either of you have any questions about the hearing procedures or the other information I've mentioned? Ms. Jones, do you have any questions?

Speaker 1 (00:21:39):
No questions, your Honor.

Speaker 2 (00:21:42):
And Mr. Sternberg, do you have any questions?

Speaker 4 (00:21:45):
Yes, I do. Ms. Beaver, in terms of the certified audio, I put in a special instruction when registering and I was wondering for the admittance of the certified audio, is there a procedure that I need to follow to be able to do that or a playback device to be able to use for that?

Speaker 2 (00:22:06):
You would need to submit it to me as well as to the employer. And so I'm glad you brought that up. When you're submitting your documents by email to the employer, you can also submit that additional audio and you can send it to them as well as to me it needs to be an playable format such as MP four. You said it's audio, so I'm assuming it's not movie format, is it just audio or does it have video as well?

Speaker 4 (00:22:31):
So it's an audio and it's an MP three format right now in an MP four format. Is that okay?

Speaker 2 (00:22:37):

Yeah, I think MP three should be sufficient. I think MP four was video, so it should be fine for audio for MP three. And so you'll just submit that. I'll give you the email address for me as well in just a moment if you need that again. And I'm not able to play it back on the record. And so what we would do is if it's entered as an exhibit, we would then take a recess, everybody would listen to it on their own and then we would get back on the record, you could testify to it and then we would continue with the hearing in that manner. That's how it's addressed.

Speaker 4 (00:23:09):
Gotcha. Okay. Thank you.

Speaker 2 (00:23:12):
Sure. Thank you. And did you have any other questions, Mr. Sternberg?

Speaker 4 (00:23:15):
No, no other questions.

Speaker 2 (00:23:17):
Okay. At this time I'd like to admit the hearing. Oh, sure. Yes,

Speaker 3 (00:23:22):
I do have a question. So reference And

Speaker 2 (00:23:27):
Is this

Speaker 3 (00:23:28):
Mr. Kramer? My apologies, yes.

Speaker 2 (00:23:30):
Okay, sure. What's your question, Mr. Kramer?

Speaker 3 (00:23:32):
So is there recorded audio evidence that is being submitted because we haven't received any recorded audio evidence.

Speaker 2 (00:23:45):
And so if the claimant does have audio evidence that he wants to submit, when he sends the email to you all of the additional documents he has, he can also include the audio and I'll give instructions on that in just a moment. Before any documents or audio is discussed, I would

Speaker 4 (00:24:00):
Take

Speaker 2 (00:24:00):

This transcript was exported on Mar 31, 2026 - view latest version here.

Some information, identifying information about the evidence to make sure it's relevant for the hearing. And then I ask for objections if there's any objections for the information being entered before it is something that is considered in the hearing.

Speaker 3 (00:24:14):
Thank you for the clarification, if that makes sense.

Speaker 2 (00:24:16):
Okay. Okay, great. All right. And did you have any other questions, Mr. Kramer?

Speaker 3 (00:24:21):
No, thank you for the answer.

Speaker 2 (00:24:23):
Thank you. And at this time I'd like to admit the hearing packet in its entirety into the record as an exhibit. So we may review and discuss the documents contained in it only address the documents in the hearing packet directly if they're relevant to the issues in the hearing. And admitting the packet is not stating that the information contained in it is accurate, but it will allow us to review and discuss all relevant and related materials. And Ms. Jones, did you have any objection to entering the hearing packet as an exhibit for consideration in the case?

Speaker 1 (00:24:50):
No objection, your Honor.

Speaker 2 (00:24:53):
And Mr. Sternberg, did you have any objection to entering the hearing packet as an exhibit?

Speaker 4 (00:24:58):
No objections.

Speaker 2 (00:25:01):
Let the record reflect the hearing packet as commission exhibit number one for today's hearing. I'm restarting the numbering, I'm making a note. Okay. And I'm going to go ahead now and pick up with the claimant's testimony, but before we get to that, let's go ahead and do the exchange of documents in audio. And just as a clarification, I'm unable to open any documents or audio that is linked to an outside server or anything that has any kind of requirement to enter a passcode or anything in it in order to access it. So Mr. Server, when you send the audio to me and the documents to the employer, if you'll make sure that they're just actually attached to the email so that they can be viewed that way? Yes. Mr. Sternberg? Yes, I'm need this file

Speaker 4 (00:25:47):
Forward right now.

Speaker 2 (00:25:49):
Okay. And did you need my email address, Mr. Sternberg again to send all that to me? Okay. I'm going to say it first and then I'll spell it out. It's kind of long. It's appeal docs@twc.texas.gov and that's spelled a PP

as in Paul, EALD as in dog, OCS as in Sam, at T as in Tom, wc dot Texas spelled out T-E-X-A-S do GOV and we're able to get that Mr. Sternberg?

Speaker 5 (00:26:35):

Yes, I was.

Speaker 2 (00:26:37):

And if you could also include in the subject line the appeal number, which is 3 9 8 3 7 7 7. And Mr. Sternberg, did you need the email addresses for Ms. Jones and Mr. Kramer as well?

Speaker 4 (00:26:53):

Yes. If I could please.

Speaker 2 (00:26:56):

Ms. Jones, what is your email address?

Speaker 1 (00:26:58):

Yes, it's jacqueline.Jones@equifax.com and that's J-A-C-Q-U-E-L-I-N-E Jones, J-O-N-E-S at Equifax, EQIS as in Frank, A x.com.

Speaker 4 (00:27:26):

I did receive that. Thank you for that, Jacqueline.

Speaker 2 (00:27:29):

Okay. And then Mr. Kramer, if you could give your email address as well.

Speaker 3 (00:27:34):

MARK dot K-R-A-E-M-E r@att.com.

Speaker 4 (00:27:48):

I do have it.

Speaker 2 (00:27:50):

Okay, great. And we'll go ahead and go on recess for 10 minutes before I pick up with the claimant's testimony so you have an opportunity to get all that together and send it over Mr. Sternberg. I'll ask that everybody remain on the line. If you get disconnected I will call you back and there can be no conversation between myself and the parties while we're off the record, we'll go back on the record at 8:40 AM I'm now muting everyone. Thank you.

Speaker 6 (00:28:14):

Thank you.

Speaker 2 (00:40:19):

This transcript was exported on Mar 31, 2026 - view latest version here.

Okay, the time is now 8:41 AM and we're going back on the record, make sure everyone's unmuted. One moment. And while we were off the record, there was no conversation between myself and the parties. Do you agree Ms. Jones?

Speaker 1 (00:40:34):

I agree.

Speaker 2 (00:40:36):

Do you agree Mr. Kramer?

Speaker 3 (00:40:39):

Yes, I agree.

Speaker 2 (00:40:41):

Do you agree Mr. Sternberg?

Speaker 4 (00:40:44):

Yes, I

Speaker 2 (00:40:46):

Great. And I received your email of those additional documents, including the audio recordings. And Ms. Jones, did you receive the claimant's email?

Speaker 1 (00:40:57):

I'm trying to check it now. My system went down, sorry.

Speaker 2 (00:41:01):

Okay. And Mr. Kramer, were you able to receive it?

Speaker 3 (00:41:05):

I did.

Speaker 6 (00:41:08):

Kick me out and

Speaker 2 (00:41:09):

Lemme know when you're able to get it up.

Speaker 6 (00:41:11):

Okay, where can I? Looks like it's on there.

Speaker 2 (00:42:12):

And I'll just note for the record received and the compressed zip file is six attachments of PDFs and then there are six MP three audio recordings where there's all the documents that you sent Mr. Sternberg?

**Speaker 4** (00:42:31):
Yes, that is correct.

**Speaker 2** (00:42:33):
Great. And are those ones you received Mr. Kramer?

**Speaker 3** (00:42:39):
Yes, I've received them and extracted the files.

**Speaker 2** (00:42:43):
Great.

**Speaker 1** (00:42:44):
See

**Speaker 2** (00:42:45):
Did you need a,

**Speaker 1** (00:42:47):
Okay, did you need one more time? I'm trying to see if I can open it. I did receive it. Oh, okay. See the table And which one is the, oh, the audio

**Speaker 2** (00:43:08):
And there are six MP three files, audio attached and there are six PDFs.

**Speaker 1** (00:43:17):
Okay, let me see. Oh it says zip file. It won't, lemme see if it'll open.

**Speaker 2** (00:43:32):
Yes, I received it as a compressive file. I just double clicked it. It was able to open for me.

**Speaker 1** (00:43:46):
Yep, I received it. I think it's going to help. I can't hear it.

**Speaker 2** (00:43:51):
Let's see. I'm sorry, did you receive it Ms. Jones, were you able to open it?

**Speaker 1** (00:44:03):
Okay, is this a recording of the last hearing? Is that what this is?

**Speaker 2** (00:44:10):
I'm going to get into the details of each of the different documents and hearing or audio recording a few moments.

here.

Speaker 1 (00:44:18):

But

Speaker 2 (00:44:18):

There are, just to make sure you received the actual ones that I show. Six MP three files and six PDFs in the zip file. Did you receive all those Ms. Jones?

Speaker 1 (00:44:27):

I did, but I'm not able to open it. Lemme try this one again.

Speaker 6 (00:44:36):

Great.

Speaker 2 (00:44:46):

And are you trying to get for the MP files or the PDFs? Ms. Jones?

Speaker 1 (00:44:50):

Just the PDFs aren't opening. Okay. Let see. Lemme see if I can get it here.

Speaker 6 (00:44:57):

Let

Speaker 1 (00:44:57):

See. Yeah, security's real. It won't open.

Speaker 2 (00:45:10):

And are you able to contact anyone internally to see if they're able to open the documents for you Ms. Jones?

Speaker 1 (00:45:19):

I can. That's probably going to take some because I have to call them.

Speaker 2 (00:45:25):

Okay, well I'll go ahead and pick up with the claimant's testimony at this time and then we'll address those documents individually and see

Speaker 1 (00:45:33):

I

Speaker 2 (00:45:34):

Make sure everybody has them. Thank you. Alright, and I'll go in the record. I'll go ahead and pick up with the claimant's testimony at this time. And Mr. Sternberg, how are you notified that you were being discharged?

Speaker 4 (00:45:47):

I was notified in a private meeting. This was the day after getting a successful pit milestone. I was brought into a room with two people, Monica Mitchell Browning, which is Mark Kramer's boss, a boss of boss in a BP at at and t and Bill Hayes. And then was told because of the timekeeping that I would be terminated.

Speaker 2 (00:46:10):
And did they give you any specific details about the timekeeping issue?

Speaker 4 (00:46:14):
No, they did not.

Speaker 2 (00:46:17):
And were you given an opportunity to explain at that meeting?

Speaker 4 (00:46:20):
I was not given an opportunity to explain the meeting.

Speaker 2 (00:46:24):
Okay. And were you absent from work on June 16th, 2025?

Speaker 4 (00:46:30):
Yes, I was because my wife was sick.

Speaker 2 (00:46:35):
And did you give the employer notice that you're going to be absent that day?

Speaker 4 (00:46:38):
Yes, I did.

Speaker 2 (00:46:41):
And who did you give notice to?

Speaker 4 (00:46:44):
I gave notice to Mark Kramer. I also gave it to the team as well just to make sure that everybody had the communication out there and that everybody on my team was aware of the situation.

Speaker 2 (00:46:57):
Do you recall how much advanced notice, if any, that you gave that you would need to be out on June 16th, 2025?

Speaker 4 (00:47:05):
I gave it the moment that it happened, it was actually kind of a quick spur of the moment thing because my wife was experiencing stomach problems at the time, so I needed to go home and take care of her.

Speaker 2 (00:47:17):

The transcript is exposed on Mar ... new layout ... here.

And do you recall what date you gave notice?

Speaker 4 (00:47:21):

I gave notice on June 16th, right in the beginning of the day when I was leaving just to make sure. And again, it was a spur of the moment incident with that.

Speaker 2 (00:47:31):

Got it. And do you recall the method by which you gave notice to Mr. Kramer?

Speaker 4 (00:47:39):

Yeah, I sent it to Microsoft Teams, which usually we had a full team chat that I sent it through and then I also kind of let him know in the process as well.

Speaker 2 (00:47:51):

And did you receive any response from Mr. Kramer before leaving for the day?

Speaker 4 (00:47:55):

I did not receive any response other than that during that day.

Speaker 2 (00:48:00):

And do you recall what time of the day it was that you left on June 16th?

Speaker 4 (00:48:05):

It was early in the morning. I don't have a specific, I believe it was around eight to 9:00 AM in the morning at that time. Okay.

Speaker 2 (00:48:18):

And does the employer have a process by which you enter a time into the N four internal hour reporting system at work? The employer testified a little bit about that at the last hearing, so I want to give you an opportunity to testify to that as well as what the process is for reporting time.

Speaker 4 (00:48:34):

Yeah, so reporting time is an infer. You have to change the time code to a sickness day at the time and then immediately after or when you come back into the office you would then be able to submit that information.

Speaker 2 (00:48:52):

Do you recall if you submitted that information of the absence on June 16th?

Speaker 4 (00:48:57):

During that time I was very busy with a lot of projects, so it had slipped my mind and then it was brought up to me by Mark Kramer to do that time submission at that time on June 16th.

Speaker 2 (00:49:12):

And just to make sure I'm clear, did Mr. Kramer tell you to enter the time on June 16th or was it different time that you had that conversation with him?

Speaker 4 (00:49:19):

Different time. It was the day after June 17th when we had this conversation.

Speaker 2 (00:49:27):

And to the best of your recollection, what did Mr. Kramer tell you at that time?

Speaker 4 (00:49:32):

Mr. Kramer talked to me about first kind of asking what happened with my wife and then in a kind of passive aggressive type of way and then reported about the timing and said you need to go into infer and update the time accordingly. With that, my wife would stick with stomach problems at the time and there was no real empathy to it. It was just very authoritarian, very angry tone towards the situation at this point, showing frustration.

Speaker 2 (00:50:05):

And then when you had that conversation with Mr. Kramer following the absence, were you able to enter the time into the timekeeping system?

Speaker 4 (00:50:13):

Yes, I did at that time.

Speaker 2 (00:50:16):

And do you recall what date you entered your time into the timekeeping system for June 16th?

Speaker 4 (00:50:23):

It was, I believe that day or the 18th.

Speaker 2 (00:50:31):

And did you have any prior discussions with the employer regarding entering your time or their dissatisfaction with your entering your time?

Speaker 4 (00:50:41):

We had had some minor warnings on it and I had gone back and corrected. The only time that it was brought to my attention about this in a disciplinary manner was during a PIP that was entered in as evidence and that PIP was given to me on July. Let me take a look at the date. Here it is. July 17th was the date that I Was you looking at

Speaker 2 (00:51:09):

Me?

Speaker 4 (00:51:10):

Yes. Insurance. What

Speaker 2 (00:51:12):

This transcript was exported on Mar 11 2026 - view latest version here.

Page are you looking at?

Speaker 4 (00:51:14):

Yes, let me get that hearing packet. I am just looking through here, my apologies. I'm trying to find the exact, the exhibit I do have the number for, but I'm just trying to get the exact page in the document for one moment.

Speaker 2 (00:51:38):

Sure, take your time. And I do see there's an on 48 dash BA show. There's a document titled PIP document. I'm not sure if that's the one you're talking about.

Speaker 5 (00:52:04):

Yes, that is the one. That is correct. Thank you.

Speaker 2 (00:52:08):

Okay, and on page 48 dash B, if you could tell me a little bit more about that document and what it was provided to show.

Speaker 4 (00:52:16):

Yep. So this PIP was given to me by Mark Kramer with an associate Bill Hayes, a colleague in Monica Mitchell Brownie Mitchell's organization. And this PIP highlights a couple of different things here I was, the justification for this PIP was random. We had fixed the incident in June randomly after talking about getting an A DA accommodation and after being written up on May 9th for that notice of discipline that was mentioned in the previous hearing, this PIP was handed to me when I received this pip. I had expressed to Mark Kramer and Bill Hayes that I was very fearful about my job and everything like that, that I needed to support my family. I really wanted to work through this pip. And some of the things that were noted in here that I have with arrows are the first being that the professional relationships they showed as current performance where he says there's a diminishing trust, it reduces the team and he falsely kind of gives my behavior in an unprofessional manner saying that opportunities to catch colleagues and offenses reports, colleagues without fact finding or clarification holds grudges even after others are cleared of wrongdoing.

(00:53:50):

These were all false statements designed to damage my professional standing and reputation and create an image of an employee that wasn't up to performance. The next thing on here you will note Ms. Beaver, is the time tracking on here. One of the things that was noted in this is that the time tracking goes all the way to the beginning of January, we've had conversations where people have miss time or not put in for correctly and it happens to a lot of people all the time. What I noticed in this one is that the time tracking portion of the PIP dated all the way back to the beginning of the year specifically the first date mentioned was 1 19 20 25. And so these are months old records that could have been brought up beforehand, but it seemed like he was compiling all the information together on exhibit 49 B.

(00:54:53):

The next page you'll see a required performance section on here. The required performance was what I needed to do to be able to pass the PIP and be able to go over the pip. Some of the things in here were designed specifically to be retaliatory in nature, so for instance, work to make teams successful by supporting the strategic prioritization sent on the backlog of work limit WIP to deliver features before pulling new work. And one of the things he does not mention is that in this WIP limit of two, every single thing that I had to work on needed to be approved by Mark Kramer, my manager to be worked on. And I

needed to show in his point of view what needed to be completed. The other thing that was presented here was deliver quality. Quality is very subjective in the sense the PIP seemed with a lot of these different fields.

(00:55:58):

Very subjective, not really quantitative. And so I immediately identified this and tried to get clarification. And at the bottom on exhibit, if we're looking at 50 b, Mark Kramer does note at the bottom in the initial meeting that I was very worried about it. I was worried about things beyond my control and that the goalposts would shift in terms of the PIP because I could sense that the PIP was very subjective. There was no real quantifiable metrics in it. And so what ended up happening after this Ms. Beaver is after seven 17, I had two meetings specifically, one was with Michelle Tubbs, which was mentioned in the previous hearing that Mark Kramer testified on. That meeting was conducted the 22nd, I passed a successful PIP milestone with no issues on the 24th. And then the following day on the 25th Friday I was terminated for my employment.

Speaker 2 (00:57:10):

And what milestones did you meet on the 24th?

Speaker 4 (00:57:13):

Some of the milestones that I met on the 24th were I had to, in terms of complete, there's two on page 50 B. One was the complete strategies to improve self-awareness, A POE course, the NOEP building and regaining trust. I also recorded my absences. I also completed deliverables by the due date that was mentioned in there. I also provided advanced notice to supervisor when I would be late for a meeting or out of office. And then I maintained the WIP limit of two during this meeting on the 24th, I could sense that Mark Kramer was extremely disgruntled by the fact that I had succeeded. And so what ended up happening afterwards was the pretext of the timekeeping was then brought into play and immediately I was terminated without any explanation, without any ability to appeal it. And I was handed a brown box to put all my belongings and then I had to leave the building at that time.

Speaker 2 (00:58:22):

And on what date were you given the pip?

Speaker 4 (00:58:25):

I was given the PIP on 7 17 20 25. So Friday, July 17th, 2025.

Speaker 2 (00:58:32):

And I show on the top of 49 dash B, that first box. It looks like it was continued from the prior page, but it says INFOR 6 16 20 25 illness announced in teams not an infor. Did you discuss that issue with the employer when

Speaker 4 (00:58:47):

You got the

Speaker 2 (00:58:47):

PIP on July 17th?

Speaker 4 (00:58:50):

This document was exported on May 1, 2026 to view latest version here.

Yeah, all of these came up as a result and I was not made aware of all of these issues until the PIP where it was looked at as a retaliation type of issue where it seemed like the PIP was trying to find any and all issues with my employment or anything that I was doing at work to be able to terminate me because of prior reports of discrimination back in 2023 as well as asking for an A accommodation before the notice of discipline. And that is exhibited in C seven. Let me see if I can get you that page for you.

Speaker 2 (00:59:33):

Well we'll move to that in just one moment, but if we could stay with the PIP first. And to the best of your recollection, did you mention anything to the employer about the time tracking entries in the PIP during that

Speaker 4 (00:59:46):

Discussion

Speaker 2 (00:59:46):

On July 17th?

Speaker 4 (00:59:48):

Yes, I actually went in on the 22nd with Michelle Tubbs. I notified her that I had corrected all of the timekeeping issues and that going forward I would not have any issues with it. So everything was corrected. Mark Framer gave me the dates specifically that needed to be corrected and then I corrected those inside of the infra system after that.

Speaker 2 (01:00:11):

And were those the same dates that were listed in the PIP that you corrected on the 22nd?

Speaker 4 (01:00:16):

Those were a fraction of them. There were, if I remember correctly, about 15, maybe like 20 other dates that were mentioned in there. But these dates were kind of like a brief subset of that. There was an Excel spreadsheet sent to me by Mark Kramer with all of that information.

Speaker 2 (01:00:39):

And do you recall what the most recent correction you had done on July 22nd?

Speaker 4 (01:00:46):

The correction was basically all the times that were mentioned in the PIP as well as the additional times that were given in the Excel sheet provided by Mark Kramer were all entered into Infor and I made sure that everything was accurately reported inside the tracking system.

Speaker 2 (01:01:04):

And did you correct the June 16th, 2025 absence in the infor system on July 22nd as well?

Speaker 4 (01:01:11):

Yes, I did.

Speaker 2 (01:01:13):

And what correction was needed?

Speaker 4 (01:01:15):

The correction was just putting the illness, which was basically changing the time code to illness and then setting the amount of hours for it.

Speaker 2 (01:01:24):

And was there any reason why you hadn't done that prior to the discussion on July 22nd?

Speaker 4 (01:01:29):

I had forgotten about it again during the time I was in a bunch of different projects that I was working on, so I was very focused inside of my work and it just kind of skipped my mind at that point. Michelle Tubs had mentioned it in what Mark Kramer referred to last hearing where I mentioned that I was forgetful and it was because I had a lot of stuff going on my plate and so sometimes I would forget and it would skip my mind, which sometimes happens when you have a lot of work on your plate.

Speaker 2 (01:02:01):

And were you notified at the time that you got the PIP that if you had any further instances of not recording the time according to the employer's policy, that you could be subject to discharge?

Speaker 4 (01:02:10):

No, I was not made aware of that.

Speaker 2 (01:02:14):

And were there any other instances after June 16th, 2025 where you needed to correct your time and infor?

Speaker 4 (01:02:20):

No.

Speaker 2 (01:02:24):

And do you know why you were discharged for the not inputting the time and infor on June 16th, 2025 if you had just received a PIP for that same issue?

Speaker 4 (01:02:35):

Yeah, to be honest, it was extremely weird because during that time, Ms. Beaver, I had actually reported about some of the passive aggressive behavior that Mark Kramer was exhibiting throughout the time when I was on the pip. During that pip, I was extremely stressed out because the way that the employer was talking to me was, well if you can get through the pip. And it gave me a sense of hopelessness, giving me the idea that either quit or just go through the PIP and if you get fired, you get fired. It is what it's, that's really the ultimatum that I was given at this time and there was no understanding of it. There was no real empathy. Mark Kramer talked about last time, grace, there really wasn't any grace and I had noted this multiple times to HR professionals inside of at and t during that time period that the passive aggressiveness was getting worse, the environment was getting worse. And I had had screenshots of teams meetings with Mark Kramer acting in this manner. So at this point I was not given a real definite on termination or not and it was kind of left up into the air and in my hands. And so that's where I kind of

This transcript was exported on Mar 11, 2026 - view latest version here.

mentioned in the PIP, that moving of the goalpost because I felt like it was in the employer's hands to make the decision on what they wanted to do with me.

Speaker 2 (01:04:07):

And who did you make the complaint to about your supervisor?

Speaker 4 (01:04:12):

There is Charlotte, and I apologize, I'm looking through my, I have emails of it, it is a couple of names on here, so please bear with me. I'm just getting that information up for it.

Speaker 2 (01:04:31):

And if you could just tell me kind of what department they're in.

Speaker 4 (01:04:35):

They are in the HR department, so I had talked to an HR representative at the time noting some of the issues in terms of how Mark Kramer was talking to me, how he was approaching me in terms of interactions in the office and everything like that. And it created a very hostile environment when dealing with the PIP on top of that.

Speaker 2 (01:05:00):

And what date did you first make the complaint to hr?

Speaker 4 (01:05:04):

That was, and I'm looking through it was with Charlotte Wise is the woman's name C-H-A-R-L-O-T-T-E Wise, she's an HR representative with at and t. And this was submitted at 9:28 AM on July 22nd, 2025. This was before speaking with Michelle Tubbs on July 22nd. That was documented.

Speaker 2 (01:05:40):

And did HR have any discussions with you about the complaint that you had filed?

Speaker 4 (01:05:45):

No. One thing to know Ms. Beaver that I apologize, I also had is during that July 17th when I did receive the pip, I did message some concerns out to an HR representative. And I messaged this out and let me see if I have the date. One of the things that I mentioned in there is I had noted to Mark and everything about the vagueness of the PIP and I highlighted a couple areas to where I wanted some understanding on this. And I never received a response from HR or anyone specifically around this commentary or any clarification.

Speaker 2 (01:06:31):

And do you know if HR was going to initiate an investigation or take any steps to address your concerns?

Speaker 4 (01:06:38):

No, they didn't initiate an investigation. They more acted on a consulting basis, just kind of heard it out. But then they kind of showed sympathies more towards the employer than me when I actually voiced those concerns.

**Speaker 2** (01:06:56):

And had you received any prior disciplinary action at work before the PIP regarding timekeeping?

**Speaker 4** (01:07:03):

No, the only prior one is a notice of discipline that was on May 9th. This one, beaver is important because a couple days prior, on March 27th, 2025, I was told by Mark Kramer and Michelle Tubbs, which is his boss, to remove my glasses and to remove them and I had to squint for the entire day. And so I submitted an A accommodation on April 3rd. After that accommodation, I was then given, I had then spoken to two representatives or two colleagues of Mark Kramer, Shane Clays and Christopher Carl on April 1st, specifically talking about the hostile environment, the fact that my glasses were removed, I didn't feel like I was in a very comfortable environment at this point. And so after that conversation, I was then kind of gaslit by Mark Kramer on, I believe it was April 4th, saying, well, we're not talking about the glasses, I wear glasses, but your glasses have a recording device. When I had specifically told the employer multiple times that those glasses were off and I had explained to them multiple times how they worked that they were off fully and still I was getting false accusations thrown at me because of this late April, 2025, Mark Kramer files a HR complaint against me, to which I have to document the glasses and everything like that. Aada a accommodation was also submitted during that time. And then on May 9th, yes,

**Speaker 2** (01:08:59):

Go ahead. And one Mr. Sternberg is the a DA accommodation, is that the one on page 1 48 dash B in the hearing packet?

**Speaker 4** (01:09:08):

Yeah, let me, I'm double checking for you. It is, yes, that is correct. So it is 1 46 through one. Yeah, 1 48 as well. So 1 48 is the actual documentation provided by the doctors. That was my primary care doctor that has an office in the at t building. So she was able to fill out the information. One thing to note on 1 48 Ms. Beaver is if you go to, I believe it is, and I'm looking through it right now following with you, it is on, it is on, let me see here. So throughout the documentation it's specifically on 1 51 B. You're going to see an indentation in there, Ms. Beaver that says smart glasses. And the doctor quotes it and says, smart glasses are not needed in this documentation. This is, and I've explained to them multiple times that the glasses were off, there was nothing going on here. And then on 1 46 B in the hearing packet, that A a accommodation I submitted and I submitted that, as you can see on May 2nd. And I was given the notice of discipline and the A accommodation being rejected on the same day, May 9th.

**Speaker 2** (01:10:47):

And is that not of discipline, the one on 1 69 dash B that you're referring to?

**Speaker 4** (01:10:58):

Yes. Sorry, my apologies. I'm just looking through the packet here. I've got, so it is, yes, it is on yes, 1 69 B. And as you can see on exhibits, I'm going back through here as well. The denial is on, let me take a look. Here it is on 1 64 B and there is, and I'm looking for the other one of the rejection, actually, I'm sorry, it is one 60 B is where you will see at the top 3:21 PM on May 9th. You will then see on 1 68 B at the bottom where the notice at discipline, everything was given that it's not, sorry, not this one. Lemme check. Here it is 1 67 B, you're going to see Friday, May 9th, 6:23 PM And the original smoking gun for this was given at, I'm looking here, it is located on 1 64 B and it says, notice of discipline. Remember that deadline is May 16th and that was issued on May 9th, 2025. So about roughly an hour in between each

This transcript was exported for Mar 3, 2026 - transcription common here.

other or less than an hour, both the notice of discipline and a accommodation rejection were given at the same time.

Speaker 2 (01:12:38):

And were you given a reason why the A request was denied?

Speaker 4 (01:12:42):

I was not. The reasoning they said was that the quote, prescription glasses or corrective lenses are not part of a DA, but are I had listed some documentation to a DA noting my driver's license and other information where basically I can operate a motor vehicle without the corrective lenses and I also can't see farsighted without my glasses being worn.

Speaker 2 (01:13:16):

And what was the reason, going back to the May 9th discipline notice,

Speaker 4 (01:13:22):

What

Speaker 2 (01:13:22):

Was the reason for that discipline notice

Speaker 4 (01:13:25):

They were saying that I was recording conversations with my phone and with my Apple Watch and they also said they had previously, in the other evidence, they had talked about the smart glasses in particular, but they switched and did phone and the watch that I was using, the reason for this is because the hostile work environment that I was in, I did not feel safe after an original HR complaint back in November of 2023 where I had reported a colleague of Mark Kramer by the name of Chip Crawford talking about Indians from India and talking about during the time of colonization. And obviously there was, my wife is of Indian descent. And so for me, being in an interracial marriage, it's extremely concerning and extremely daunting that this type of information would be brought up. So I brought this up to Mark Kramer and Mark Kramer went through the channels to go through with hr, but there was no corrective action taken against the colleague whatsoever in terms of this incident. So since that toxic environment was created, I needed some sort of recording to be able to protect myself and not create a, he said, she said type of scenario or record it in email where it could be written documentation that the employer could use against me.

Speaker 2 (01:15:09):

Okay. And did the employer have a policy on how to enter timekeeping at work?

Speaker 4 (01:15:18):

Yes, they did.

Speaker 2 (01:15:21):

And do you see that in the hearing packet by any chance

Speaker 4 (01:15:26):

In the hearing packet? It's not really given specifically around when I'm reading, looking through the hearing packet, the big thing that I noticed is that Infer was one of those systems, Ms. Beaver, where time could be entered at any time. There was no real monitoring of it. Usually I'd been there for nine years and I'd had moments of not correcting it and I went back and corrected it and it wasn't an issue with previous managers that I had, but now it's become an issue with Mark Kramer to where he kind of used it as a sort of ammunition against me to try to justify why or how I should be terminated because of the previous complaints that I had mentioned before.

Speaker 2 (01:16:18):

And did you have any conversations with Mr. Kramer prior to the PIP about including or reporting your time in the Infor system or about how the timeframe by which you need to do so?

Speaker 4 (01:16:31):

No, not really. It was brought up not really in that way, in passing, it wasn't like a real in-depth conversation with this Ms. Beaver. It was very casual, very easygoing, and I was usually able to correct it. It was not until the PIP that I started to see that I was put under a microscope and that every single action that I was taking, what kind of work I was bringing in my timekeeping, all of that was then put under a scrutinized microscope. And then after the pip, as I mentioned before, Mark Kramer showed a lot of frustration and disdain and I could tell that they were trying to find some sort of reason to terminate me. So the next day I was then terminated for the timekeeping aspect and it was put on my record for background check potentially that it would be a violation of policy and that would pull up possibly if I were to go for another job.

Speaker 2 (01:17:35):

And do you know how long during your employment was the Infor system new or had it been there since you were hired?

Speaker 4 (01:17:42):

The Infor system was, I would have to say two to three years old. They had been changing systems around constantly, Ms. Beaver, so processes for timekeeping changed pretty exponentially. We had had other types of timekeeping systems before that and the employer was going through a phase of trying to figure out how to accurately do that time or how to accurately report it in a way. So there have been other tools that they were using before that.

Speaker 2 (01:18:13):

And what was the normal process for entering time in the Infor system after an absence?

Speaker 4 (01:18:19):

Typical policy was you would go into infer, you would be logged in via secure sign-on, and what you would do is you would go into that particular date, there would be a timekeeping that would say regular hours and it would show eight. That usually meant that you were on a regular working day. There was a time code for illness, they had one for illness, vacation, and otherwise on there. And so you would just enter according to what activity you were doing, that specific information.

Speaker 2 (01:18:54):

And was there a time in which you would normally input your leave and the in for after the leave occurred?

This transcript was exported on Mar 1, 2026 view latest version here.

**Speaker 4** (01:19:00):

Yes, that is correct.

**Speaker 2** (01:19:05):

What was your normal practice after having leave? What timeframe did you normally input it into Infor?

**Speaker 4** (01:19:12):

If it was a vacation, I would usually do it beforehand to make sure that all the books were kind of matched up. If it was an illness or a day that I had to take vacation that was at random or even just something spur of the moment because of an emergency with family or anything like that, I would put it into the system and I would put the time codes accordingly. There were times that I did forget about it because obviously I was more focused on my family or the issue at hand and focus on my work that sometimes that would just skip my mind. That's also noted in what Michelle said with my forgetfulness, which is fact because I had a lot of projects and things that I was working on at the time. So there was tendencies for me to sometimes for it to accidentally skip my mind.

**Speaker 2** (01:20:05):

And just to make sure the record is clear, did you have any further absences leaving early or tardies after June 16th, 2025?

**Speaker 4** (01:20:14):

No, I did not.

**Speaker 2** (01:20:17):

And is there any reason, because you mentioned earlier that you had updated the time entries on July 22nd, 2025. Is there any reason why you didn't do so when you received the PIP on July 17th?

**Speaker 4** (01:20:30):

I had done it actually days beforehand with that Ms. Beaver, so it was one of my first activities. The only time that it was brought up with that is that I was focused on first dealing with the PIP because of the emotional distress that I was exhibited because of it. The first day I processed, kind of just going through my work and satisfying all the different requirements that Mark Kramer had and just getting a lot of that clarification. And then on the 22nd, I did submit that time in and I wanted to make sure, but it was the first thing that I did for the PIP and to make sure that all time was accurately recorded. Before I met with Michelle Tubs, to which that meeting was documented that Mark Kramer mentioned.

**Speaker 2** (01:21:16):

Okay. I don't have any further questions for you. Were there any of the exhibits or documents that you submitted that she wanted to discuss for the hearing today regarding your separation?

**Speaker 4** (01:21:26):

Yeah, so there are a couple things. So I do want to mention on record, Ms. Beaver, the audio recordings that I have are testimony that was from the September 30th hearing. There's one audio clip in particular in there that I would like to enter in as an exhibit. That one is twofold, which is there's an MP three file that says Mark Kay. Policy Not handy. That is my first exhibit. This is a common behavior that Mark Kramer exhibited throughout my time When,

**Speaker 2** (01:22:04):

Just one moment.

**Speaker 4** (01:22:05):

And

**Speaker 2** (01:22:06):

Before we discuss it, Mr. Sternberg, are all of the audio recordings, the six of them that you submitted, are those all recordings from the testimony taken at the prior hearing?

**Speaker 4** (01:22:15):

That is correct, yes.

**Speaker 2** (01:22:17):

Okay. This won't need to be entered as an exhibit since the testimony taken at the prior hearing is already going to be considered and my decision that I'll be issuing. So those won't be something that you'll need to enter separately as an exhibit. And just to clarify, the issues in the hearing today is regarding your separation, but if you'd like to give some more testimony, feel free regarding your separation or as it relates to your supervisor.

**Speaker 4** (01:22:41):

Yeah, it's relating to the separation and it's also relating to the reasoning behind the separation. And I'll dive into a bit more detail in a second, but I do want to play the two clips that I have here is Mark Hay policy not handy and marque pause. And then he talks about grace in terms of timekeeping. And this relates to the policy around timekeeping because usually with timekeeping, as I mentioned previously, Ms. Bieber, it was not really a big offense. That would be determination.

**Speaker 2** (01:23:16):

And again, you won't need to play them because I'm already considering it for my decision. So if you'd like to give any testimony regarding your separation, you can rephrase.

**Speaker 4** (01:23:25):

Absolutely. So a lot of what's happening here is there's three truths to be proven in the certified evidence. First is the retaliation. Retaliation, which I was terminated for succeeding, which was me passing the purse PIP check-in, and I was immediately terminated the following days. PIP check-in was July 24th and my separation was July 25th. The other thing is pretext, which is the willful misconduct reason, which was fabricated and it was proven by Mark Kramer's admission that the timekeeping policy wasn't applied before and that we had given some sort of grace in this. Those were the words accurately put from the certified audio evidence from September 30th. And lastly is fraud at t committed perjury. And when KA continued their fraud upon this tribunal through improper ex part communications. Previously in the September 30th meeting, we had spoken about an email being provided to me by the employer to send all that documentation. That email was not provided until after I sent the motion of sanctions. And at that point I started receiving secure email communication from Jacqueline Jones. And so the evidence proves, yes, go ahead. Okay. Mr.

**Speaker 2** (01:24:55):

The transcript was exported on Mar 31, 2026. View latest version here.

Sternberg, I'll just go ahead and make a ruling for the record. Any motion for sanctions will be denied the hearing or this is an administrative fact finding hearing. So the district courtroom procedure is not followed. If you did want to pursue any type of sanction for perjury or anything else, you need to contact your local DA office or seek independent counsel. But did you have anything further you'd like to say Mr. Sternberg, regarding your separation?

Speaker 4 (01:25:24):

Yes. Really the big thing here is after requesting an A DA accommodation and reporting discrimination, I was placed on the pip. And on July 24th, 2025, I successfully met all the PIP requirements. The very next day I was terminated. Now was this reason legitimate? No, it was a complete pretext and the recording proves that the timekeeping policy wasn't strictly enforced before my protected activity and the willful misconduct reason was manufactured after I engaged in a protected activity. One thing to mention, which is in supplemental packet number three, Ms. Beaver, is there is an exhibit called I one and it shows the UPS tracking That was Yes. Go right ahead.

Speaker 2 (01:26:16):

Okay. Okay. And are you talking about the Exhibit I dash one regarding the documents that were submitted for the prior hearing?

Speaker 4 (01:26:32):

Yes, that is correct. So because I would not

Speaker 2 (01:26:35):

Get, and Mr. Sandberg, that won't be relevant for the hearing today, so I won't be entering those documents as an exhibit, but did you have any further testimony you'd like to get regarding your separation?

Speaker 4 (01:26:47):

Yeah, a lot of this situation that happened with my separation is because of reporting protected activity and reporting issues. That was happening in management where management was talking about irrelevant and illegal type of commentary like Indians from India and India during the time of colonization, which is considered talking about race. In this scenario, HR did not take any steps to rectify the situation. And so a hostile environment was created there forward when talking about or even voicing concerns, Mark Kramer and management showed a lot more resistance towards me than any other individuals on my team. And the other thing about this was that even after submitting the a DA accommodation, I was still given a notice of discipline. My side was not really taken when it came to asking for the justification on why I had those glasses or anything like that. And then the timekeeping in the policy it says up to, it says up to termination, which means that the employer has the opt-in.

Speaker 2 (01:27:58):

And Mr. Sternberg, what page are you referring to in the hearing packet on the policy?

Speaker 4 (01:28:06):

I'm looking for the policy, but it was mentioned in the previous hearing, Ms. Beaver, where we were talking about timekeeping policy and the timekeeping policy says up to termination is what I'm referring to. I'm trying to find specifically where it is in the packet. I am looking through the packets right now. I

apologize because we were talking about the timekeeping policy last time, Ms. Beaver with Mark Kramer when he testified. And one of the things, Mr. Chairman,

Speaker 2 (01:29:09):

You can go ahead and testify to that issue.

Speaker 4 (01:29:11):

Yeah,

Speaker 2 (01:29:12):

Just wanted to make sure you weren't reading from any documents and as I was looking at in the hearing packet, but you can go ahead and give your testimony Mr. Sandberg.

Speaker 4 (01:29:18):

Perfect. Thank you. So really the big thing here is Mark Rimer mentioned in the policy previously in the September 30th hearing about up to termination in terms of the policy when it came to any sort of discipline, this type of up to termination gives the determination that the employer can pick up to termination for an employee and that is out of the employee's power or will to be able to do that. And so all of this in mind, even after reporting everything really, I was left in a very toxic environment where even during the pip I was not given the support that was needed during that time where Mark Kramer was very hands off, didn't want to deal with me, showed a lot of disdain whenever I asked him about anything. And so at this point I realized that the PIP was just something to manufacture for documentation to show falsely that I was a poor performer and a way to terminate me because of the fact that I had brought up previous illegal concerns that were not addressed by HR and or my manager Mark Kramer.

Speaker 2 (01:30:39):

Okay. Did you have anything further you'd like to say Mr. Erenberg, regarding your separation that you haven't already stated?

Speaker 4 (01:30:44):

Nope, that is it, your Honor.

Speaker 2 (01:30:47):

And Ms. Jones, did you have any questions you'd like to ask Mr. Sternberg? Any question format?

Speaker 1 (01:30:53):

Yes. Mr. Sternberg, did you receive the notice of discipline or final written warning on 20 A on May 9th, 2025?

Speaker 4 (01:31:11):

Yes, I did.

Speaker 1 (01:31:13):

Okay. And did you read it and understand it regarding what was expected?

Speaker 4 (01:31:22):

This transcript was exported on Mar ... 2026 - view latest version here.

I did read and understand it and I also had questions sent back to Monica Mitchell Browning over some confusion on the document as well because there were some areas of the document that I was trying to get basic understanding for, and so I posted those questions out to Monica Browning Mitchell to get clarification.

Speaker 1 (01:31:43):

Okay. And did you understand that any further violation of Code of Business conduct could lead to termination of your employment?

Speaker 4 (01:32:01):

The only issue with that Ms. Jones is that the idea of could means that there's a idea that there's an option or a possibility of it. However, this was really the only notice of discipline or the major violation that I was received or given. There was no other violations before that point.

Speaker 1 (01:32:23):

Okay, and did you read that before you signed it? Understanding what it meant regarding disciplinary action going forward?

Speaker 4 (01:32:36):

I read it and I asked for clarifications. I knew that if I even said that I would not sign it, that I knew that I would be at the possibility of termination because I wasn't signing that document.

Speaker 1 (01:32:52):

Okay. And did you review the code of Business conduct as it stated there before signing it?

Speaker 4 (01:33:08):

Yes, I did.

Speaker 1 (01:33:10):

Okay. So in the business code of conduct, did you also understand that it was your responsibility as an employee, as all employees in your business unit to record your time out of the office accurately into the system? Not that day. Immediately afterwards,

Speaker 4 (01:33:35):

This was not given to me in the code of business. I had read the code of business and I had read the documentation about timekeeping, but from various managers including Mark Kramer, not up until that notice of discipline was it given a harsh warning of timekeeping was the big issue at this point or that it would lead up to termination.

Speaker 1 (01:33:59):

Okay. So at that point, May 9th, 2025, you knew that you needed to follow those code of business conducts regarding recording your time?

Speaker 4 (01:34:14):

That is correct. However, the objection that I have to this is that when it comes to the time coding, I made all of the corrections up to that point and made the corrections soundly as directed by management, but

then being violated after for timekeeping, for prior offenses, before this code of business conduct and before the PIP was even given. Really to me it's a bit worrisome or a bit of an unknown for that to happen.

Speaker 1 (01:34:46):

Okay, so isn't it true after May 9th and you signed off on that final warning that May 13th, 2025 you were out of the office for illness that was not recorded and in for your timekeeping tracking system,

Speaker 4 (01:35:08):

Ms. Jones? As I had mentioned previously, I had

Speaker 1 (01:35:10):

Gotten on, I'm sorry, it's a yes or no, I'm sorry, that's a yes or no question and you can explain

Speaker 4 (01:35:22):

To Ms. Jones that is irrelevant in the conversation because you can say, I could say with this no and say

Speaker 1 (01:35:30):

The reason

Speaker 4 (01:35:32):

And say the reason for this,

Speaker 1 (01:35:33):

Your Honor, he's refusing to answer my question. It's a yes or no question first.

Speaker 2 (01:35:38):

And Ms. Jones, if you could go ahead and let Mr. Sternberg give his answer. Go ahead Mr. Sternberg.

Speaker 4 (01:35:44):

Yes, so in this context, as I had mentioned, I had forgotten about the policy, I had forgotten about it and I had had a moment of lapse because I was dealing with a lot of work and entering time into infer was considered. It's the practice of of business conduct to be able to enter it in. But in terms of timing and everything like that, it was not strictly enforced across every single employee. That time had to be put in correctly. There was some leniency and I had seen leniency across the various business units that I'd worked in prior to working with Mark Kramer and the Agile Center of Excellence. And so to answer your question, no. Yes, it's explicitly put in the policy to give the time recording and to put it into in info. However, it was not a strictly enforced policy that was done across the business.

Speaker 2 (01:36:42):

I'll go ahead and interject here real quick. Mr. Jones, just to help with the questions. And Mr. Erenberg, were you absent on May 13th, 2025 for illness?

Speaker 4 (01:36:50):

Yes, I was.

This transcript was exported on Mar 1, 2026 view latest version here.

Speaker 2 (01:36:52):

Okay. And did you properly report that time absent and in for

Speaker 4 (01:36:58):

When I was made aware of it, yes. And as I'd mentioned I'd forgotten to do it because during the times, a lot of the times when I would come into work, Ms. Beaver, I was very focused on the work that I was doing at hand and so things like the small timekeeping and administrative would sometimes skip my mind in this scenario.

Speaker 2 (01:37:16):

And was the May 13th, 2025 in for entry one of those ones that you corrected on July 22nd?

Speaker 4 (01:37:22):

That is correct, yes.

Speaker 2 (01:37:25):

Okay. Ms. Jones, you may continue with your questions. So Mr. Sternberg?

Speaker 1 (01:37:29):

Yes. So Mr. Sternberg, after May 13th, were you again out of the office for illness on June 16th, 2025 and did you record that and in for system or when you returned the next day?

Speaker 4 (01:37:43):

Again, I had forgotten about it and I did not enter it in on June 16th. Again, it was because of my wife being sick, and so it was brought up to me and I corrected that timing, not until the July 17th was then all of the recorded timekeeping of discrepancies shown to me in an Excel sheet that Mark Kramer has. And so that created a huge discrepancy of why would you go back the entire time or the entire year for the issue if normally it was done in casual passing.

Speaker 1 (01:38:18):

Okay. And did you understand the importance of entering your time correctly each time you were out of the office? Yes. Okay. And did you understand that it was your responsibility to report the time and not your supervisors or managers?

Speaker 4 (01:38:35):

I understood it was my responsibility to be able to do that. However, given the heads up most of the time with managers that I had dealt with across at and t, most of the time it would just be brought up casually. I would make the correction, we would go about the time when it was brought up to the PIP as something that would be fireable and giving a bunch of different dates, dating back all the way to January. I could tell that there was a bit of retaliatory and this had occurred after submitting an A request for my glasses and him falsely accusing me of recording on April 3rd when I was out sick and he forced me to come into the office to return a mail key for an event.

Speaker 1 (01:39:22):

Okay. So when you were made aware of the time not

**Speaker 4** (01:39:30):

Being

**Speaker 1** (01:39:31):

Reported on June 24th by your supervisor, why didn't you do it right away then if you knew you were forgetful?

**Speaker 4** (01:39:41):

Because I had a lot of work going on and obviously we had a lot of stuff going through at that time. I had gone back and taken looks at it and it was not made to my attention. So it's not willfully that I did something to do it, it's just that when it comes to this situation, obviously I'm going to forget I have a lot of work that I'm doing as an A COE person. I had a lot of tasks that I was doing inside of my team, so there was a chance that I would forget that type of information because it was administrative.

**Speaker 1** (01:40:13):

Why didn't you have it done at least by June 30th? By the end of the month? Since this was a June absence,

**Speaker 4** (01:40:19):

I was not made aware, Ms. Jones, that the policy was by the end of the month to be able to do it. I was not given any sort of information about this in terms of that it would throw off some sort of balances. Only when I received the pip did I actually get this information or was I actually told this is the reason for it, it's going to mess up timekeeping from the company's perspective.

**Speaker 1** (01:40:42):

Okay. And at any time, what responsibility did you take for not reporting time as required by the process?

**Speaker 4** (01:40:52):

I took responsibility by admitting fault to it and I would go in and correct it. I even went in immediately after this was brought to my attention. Being able to take in and be able to, on the 22nd, be able to enter the time in on the 21st. Of course I'm going to be emotionally distressed because Mark Kramer, along with Bill Hayes did not provide any emotional support in terms of the PIP or didn't provide anything showing that they really valued my work at the time, they were more just telling me, just go through the PIP and see what happens. And so at that point, I knew that all of this was going to potentially end in termination, so I was very worried about my family. I was very worried about supporting my family and all of this stuff. So naturally the emotional distress is going to hit the first day, especially when it's given to you on a Friday and then you have to come in Monday the following day to be able to deal with that.

**Speaker 1** (01:41:46):

Isn't it true that you received the PIP on July 17th, but you didn't make the corrections until July 22nd?

**Speaker 4** (01:41:56):

Again, the corrections specifically, and you're mentioning that gap of why would it not be done immediately is because during that time I'm experiencing emotional duress of the situation where I have a lot of stuff going through my head, I've got to worry about my family. I don't know if I'm going to be terminated the following week. There was no determination on that timeframe. And what I was told was just go through the PIP milestones and see what happens. So naturally I'm going to be distressed for the

first couple of days having to deal with that. I didn't have any emotional support from Mark Kramer or anybody on my team as some of the information in the PIP was extremely vague, like the WIP or the delivering quality of work was not really specifically done by the team. And so there was a lot of vagueness, a lot of stuff that I was trying to get my head wrapped around. And not only that, just the passive aggressive behavior that Mark Kramer was exhibiting towards me and the fact that he was showing no support kind of gave me the inkling that I was being set up to be terminated at some point, but I did not know at what point.

Speaker 1 (01:43:06):

Okay. At any point did you not understand how to place your information into the infra system?

Speaker 4 (01:43:15):

No.

Speaker 1 (01:43:16):

Okay. And you mentioned that you knew the importance of it. Is that correct?

Speaker 4 (01:43:25):

I did not know the importance of it until the pip. That's the clarification I want to make here is that I was not giving any prior notification of it to say this is important because of X, not until the PIP and actually seeing this information was it then communicated to me that issue.

Speaker 1 (01:43:43):

Okay. Isn't it true that when you had a review with Ms. Browning that you indicated to her that you understood the importance of it?

Speaker 4 (01:43:56):

When it came to Browning Mitchell, it was the understanding of the notice of hearing. It was not the understanding of the timekeeping in that respect. That was not communicated to me by Michelle and it was not communicated to me by Browning Mitchell either. It was only communicated through that pip. At that point. I saw the urgency and I did do it on the 22nd after first kind of dealing with the emotional distress around the entire situation because my job that I'd been at for nine years was potentially in jeopardy at this point. And so it was going to take me time to be able to process that information and then be able to handle everything else and be able to do the timekeeping and everything in a quality manner.

Speaker 1 (01:44:38):

Okay. Did you, one second. Isn't it true that you had previously been reminded about the importance of accurate timekeeping by Mr. Mark Kramer before June 16th?

Speaker 4 (01:44:58):

That is correct. The reminders were casual. They were not shown in a nature to say that it was going to eventually turn into a policy violation. It was not until that PIP that I was made aware that that type of timekeeping would be used as some sort of weaponry to be able to find a probable cause to terminate.

Speaker 1 (01:45:17):

Okay. Was there a reason when you answered that question initially, you said that that was the first time the recent reminder from Mr. Kramer in June was the first time that you'd ever heard it?

Speaker 4 (01:45:29):

Yeah, because this time it was more of a more in-depth conversation. It was not a typical conversation most of the time, as Mark mentioned, it's like a tiny brief, brief reminder. It was not anything more specifically on the 16th, he cave this more kind of stern kind of talking towards tone on the 16th and kind of made it a bigger deal. So anybody talking in casual passing of, Hey, you got to go do this, any normal person like myself would take, okay, I I'm getting to that, I'll do that. It's not a big deal. And it wasn't given the seriousness until that date of the 16th to where Mark Kramer kind of came off in this extremely passive aggressive manner to do this. And this is after all of the pip, the notice of discipline, all of this transpired. I could tell that Mark Kramer's attitude towards me changed exponentially.

Speaker 1 (01:46:27):

Okay. And so did you understand that after July 16th and your tip on the 17th and your conversation with Ms. Browning, Rachel, that this is what led to your separation of employment?

Speaker 4 (01:46:44):

It was not given to me expressly because the day before on the 24th, I was given a successful PIP milestone, which showed that I was actually following everything to a T and that I was doing my best and hardest due diligence to A, keep myself in the job B, be able to satisfy the requirements of everybody that was involved. And then the 25th, then this timekeeping issue comes up because Mark after that time had shown frustration after that meeting, which I could sense they were just trying to find a reason to terminate me after that point.

Speaker 1 (01:47:22):

So did you understand at that point that you were being terminated based on code of business conduct violation?

Speaker 4 (01:47:30):

It was not given to me in that sense. No.

Speaker 1 (01:47:32):

Thank you, sir. I have no further questions.

Speaker 2 (01:47:36):

All right. And I'll go ahead and turn back to the employer for testimony at this time. And I'd like to address the additional documents that were submitted by the employer. Just one moment. Let me pull those back up.

Speaker 4 (01:47:48):

System,

Speaker 2 (01:47:49):

here.

Shut it down. Okay. And I show that there's four additional documents submitted by the employer for the hearing today, including cover sheets, the And Ms. Jones, if you could tell me without reading from 'em, what are the documents that you submitted for the hearing today outside the packet?

Speaker 1 (01:48:11):

The documents? Yes, your Honor, that were submitted today were specific infractions that the employer felt that the claimant had regarding dates that he was out of the office and did not enter into their inferred system as directed, and that he had been given prior warnings after he hadn't showing that he was reminded to do this. And then it also talks about the time reporting policy. It outlined it there, showing that this was his responsibility to do and that when he failed to do this, this was escalated and he was given an escalated review with Ms. Browning Mitchell and asked questions regarding the sign a warning in reference to why he didn't do And

Speaker 2 (01:49:12):
Ms. Jones

Speaker 1 (01:49:14):
And

Speaker 2 (01:49:14):

Ms. Jones, I show the email as part of the employer's additional documents includes an email sent July 23rd, 2025. Is that correct?

Speaker 1 (01:49:24):
Yes.

Speaker 2 (01:49:25):

Okay. And since that was prior to the date of the claimant's separation, I'll go ahead and ask Ms. Jones, is that email a true and correct copy of the original made during the ordinary course of the employer's business?

Speaker 1 (01:49:36):
It is, your Honor.

Speaker 2 (01:49:39):

And Mr. Sanberg, did you have any objection to entering the employer's additional documents as an exhibit for discussion in the case today?

Speaker 4 (01:49:48):
Nope. Please proceed.

Speaker 2 (01:49:50):

I'll go ahead and enter the employer's additional documents as commission exhibit number two. Bear with me just one moment while I mark the record. For the record. It's exhibit two four pages, employer's documents. Okay. And I'll go ahead and turn to the employer for testimony for additional testimony at

this time. And Mr. Kramer, do you have access to that additional email that was submitted for the employer that's dated July 23rd, 2025?

Speaker 4 (01:50:19):
I do.

Speaker 2 (01:50:20):
And if you could describe what that was provided to show I

Speaker 3 (01:50:24):
Sure. When the PIP was underway, we were under advisement from HR to gather all of the appropriate background information about performance issues with Mr. Sternberg. And one of those was time reporting. And so that required an audit of his time reporting balance against messages or notifications of being out. So that was asked for to go back to the beginning of the year. And when we did, we found the infractions that are listed in this message. And so I escalated it to my supervisor, Michelle Tubbs, who performed the interview with the answers as recorded in this email.

Speaker 2 (01:51:24):
And were the claimant's answers in that meeting with Ms. Tubs considered in the claimant's discharge?

Speaker 3 (01:51:35):
Yes.

Speaker 2 (01:51:37):
And were you present during that meeting with Ms. Tubs in the claimant?

Speaker 3 (01:51:41):
I was not.

Speaker 2 (01:51:45):
And is there any reason, or let me ask this different, did the claimant have any other instances of absences leaving earlier tardies after June 16th, 2025?

Speaker 3 (01:51:58):
The absences that were not recorded after his final written warning for code of Conduct business were on May 13th and June 16th. And at the time of the audit, which was probably two days before this call, those were still not entered in the system as the policy shows also in this exhibit, the deadline is the first or the 16th of the month, which is the end of the pay period for each day. So both of those were clearly beyond those time periods.

Speaker 2 (01:52:47):
And I am looking at the document titled Additional Evidence for Consideration. On the bottom of that page, it shows a number 28. What is that number 28 copied from or where is that located in?

Speaker 3 (01:53:04):
That is from the time recording policy in the Code of Business conduct.

This transcript was exported on Mar 11, 2026 - view latest version here.

Speaker 2 (01:53:11):

And did the claimant receive that code of business conduct and the time recording policy? Was it in it during his employment?

Speaker 4 (01:53:18):

Yes.

Speaker 2 (01:53:21):

And do you know when he received it during his employment? Was it when he was hired or some other time?

Speaker 3 (01:53:28):

It is part of the orientation process. And the claimant signed an acknowledgement after his final written warning stating that he had read the Code of Business Conduct.

Speaker 2 (01:53:46):

And for the record, was that the final written warning dated May 9th?

Speaker 4 (01:53:50):

Correct.

Speaker 2 (01:53:53):

And is there any reason why the claimant was discharged when he had just received a PIP for the same incident?

Speaker 3 (01:54:05):

This was because there was a final written warning saying that any breaches of the policies could lead to disciplinary action in conferring with HR determined that a given for code of Conduct, code of business conduct and so therefore these infractions that occurred after that final written warning warranted termination.

Speaker 2 (01:54:38):

And did you have any further testimony you'd like to give Mr. Kramer regarding the claimant's separation?

Speaker 3 (01:54:43):

No, that is all. Thank you.

Speaker 2 (01:54:46):

And Ms. Jones, did you have any questions for your witness, Mr. Kramer?

Speaker 1 (01:54:50):

I did not, your Honor. Thank you.

Speaker 2 (01:54:53):

And Mr. Sternberg, did you have any questions you'd like to ask Mr. Kramer in a question format?

Speaker 4 (01:55:00):
Yes. So Mr. Kramer, when for the notice of discipline, was the notice of discipline the first discipline that was given, or was it the first violation that was given to the employee?

Speaker 3 (01:55:20):
No. You received a Which notice of discipline are you referring to?

Speaker 4 (01:55:29):
The May 9th Notice of Discipline.

Speaker 3 (01:55:37):
I'm not unsure that I understand your question. There were a series of discussions that we had up until then and this final, as it's stated in the evidence that's here, describes that you admitted to violating the Code of Conduct, code of Business conduct by recording Conversations without consent. You admitted to that during the investigation and the result of the investigation was a final written warning or no further infractions against Code of Business conduct as notice the letter,

Speaker 4 (01:56:25):
My apologies, Mark Kramer, before the notice of discipline on May 9th, were there any other violations given before that notice of discipline date of May 9th?

Speaker 3 (01:56:38):
There were a series of, yeah, coaching logs about the issues with recording specifically on time recording all the way back to December. You and I had conversations about making sure that the time it was recorded accurately. All of those were in our one-on-one conversations, typically through Microsoft Teams meetings.

Speaker 4 (01:57:09):
What I'm referring to specifically Mark Kramer is were there any documented violations before the notice of discipline on May 9th to the claimant?

Speaker 3 (01:57:20):
There's coaching log and a series of investigations. I think I'll leave it at that.

Speaker 1 (01:57:28):
I think the question has been asked and answered. Objection.

Speaker 2 (01:57:33):
And Mr. Sandberg, did you have any other questions for Mr. Kramer?

Speaker 4 (01:57:38):
Yes, Mr. Kramer, for the policy you had mentioned previously in September 30th that the policy was up to termination. Is that correct?

Speaker 3 (01:57:51):

Yeah, that's as stated on the final written warning.

Speaker 4 (01:57:57):

Understood. So does that, if up to termination, does that possibly give or does the language give that the employer has the ability to choose what sort of disciplinary action to take?

Speaker 3 (01:58:18):

It does

Speaker 4 (01:58:22):

No further questions for me, your Honor.

Speaker 2 (01:58:25):

Okay. And I'll go ahead and turn back to Mr. Sternberg for testimony. Mr. Sternberg, did you receive the employer's Code of business conduct during your employment?

Speaker 4 (01:58:35):

Yes, I did.

Speaker 2 (01:58:38):

And part of the employer's additional documents includes Title 28, when should edits be completed? So they apply in the current pay. Did you receive that policy was in the code of conduct during your employment?

Speaker 4 (01:58:54):

Yes, that is correct.

Speaker 2 (01:58:58):

And do you recall when you received it,

Speaker 4 (01:59:02):

The code of business conduct for, let me clarify this, Ms. Beaver, are you talking for this specific incident or when I first received it while working for at t.

Speaker 2 (01:59:13):

Oh, thank you. When you first received it working for at and t,

Speaker 4 (01:59:17):

That was in June 28th, 2016.

Speaker 2 (01:59:24):

And did that policy change during your employment?

Speaker 4 (01:59:28):

Texas Workforce Commission - AT&T - 3983777 10.3... (Completed  03/20/26)    Page 44 of 49
Transcript by Rev.com                                                                     59

No, it did not.

Speaker 2 (01:59:30):
Okay. Did you have any further testimony you'd like to give Mr. Sternberg regarding your separation?

Speaker 4 (01:59:35):
Yes. One thing to note on this Ms. Beaver that you had mentioned was about the time reporting. Now, the time reporting was consistent, however, the pages of documentation, most of the time when it came to most employees that were actually looking at the documentation because of the length of the documentation, people would look through it. But in terms of the actual time reporting itself, it was extremely casual in terms of just updating the infer and everything like that. It was not looked at as incredibly disciplinary at this point. I had been with at t for previous years and even with previous systems and even with the current system that we had in infer setting, those times would happen. Some people would be forgetful. I had my forgetful moments because I'm more focused when I go into work. Ms. Beaver focused on the work and actually making an impact with my team and being a valued performer with this. And so really when it came to that piece of it, it was not as strictly enforced. And the other thing I want to mention is I mentioned Mr. Kramer about the policy saying up to determination and the language that at and t uses for the code of business conduct to say could means that the employer has full jurisdiction into what level of punishment that the employee has to endure. That's it from my additional testimony, ms. Be

Speaker 2 (02:01:07):
Okay. And are those, that email that the employer has as commission exhibit number two that's dated July 23rd, 2025, does that accurately reflect the questions and answers that were stated in that meeting on July 23rd?

Speaker 4 (02:01:24):
On the 22nd? Yeah, with Michelle? That is correct. Those were the truthful, the truth that I gave to Michelle Tubs on it originally, as I had mentioned, this was not taken as a harsh punishment or anything like that. Most of the time it would just be a correction. It would be then taken forward. This became more evident after July, 2024 where I was given a project that I had had difficulty on previously with hopes that I would fail that along with other things, along with after completing the successful PIP milestone, I could tell that Mr. Kramer was extremely frustrated that he could not find a reason. And so the timekeeping became the pretext for them to terminate my employment at that point, which goes back to upon could lead up to termination clause that the employer has, which means that it's subjective up to the employer's whims and or the manager.

Speaker 2 (02:02:31):
And did you have any further testimony you'd like to give Mr. Sternberg regarding your separation that you haven't restated?

Speaker 4 (02:02:36):
Nope. That's it from me. Thank you, Ms. Beaver.

Speaker 2 (02:02:39):
Thank you. And Ms. Jones, did you have any questions for Mr. Erenberg?

This transcript was exported on Mar 11, 2026 - view latest version here.

Speaker 1 (02:02:45):

No, your Honor. Thank you.

Speaker 2 (02:02:47):

And Ms. Jones, did you have any further questions for your witness, Mr. Kramer? That has already been answered, asked and answered

Speaker 1 (02:02:55):

Just one. Let's see. Mr. Reman, you heard the claimant's testimony regarding the reason for separation and issues that happened. Is there anything you'd like to add that hasn't already been stated or clarified?

Speaker 3 (02:03:14):

Yes, go ahead. It's important to note, when I was asked before, when are employees made aware of the policy besides onboarding and besides Mr. Sternberg signing after the final written warning that he had indeed reviewed the code of business conduct every year, part of our compliance required compliance training is to review that code of conduct, code of business conduct. So that happens on a regular basis. I believe there's evidence that Mr. Sternberg submitted of all of his training, and so it would be listed in there multiple times as well. The other thing that I guess I would just note is a discrepancy in Michelle Tub's interview with Mark Sternberg. She asked the question, have you previously been reminded about the importance of accurate timekeeping? In that interview, mark answered that the recent reminder was the first time, and that's just in conflict with my recording or my log of mentions to mark through the prior year. And in his prior testimony today, he acknowledged that he had been reminded about it. So I just wanted to point that discrepancy out. Apart from that, no, I'm satisfied with what's been shared.

Speaker 1 (02:04:55):

Thank you. No further questions, your Honor.

Speaker 2 (02:04:58):

Thank you. And Mr. Sternberg, did you have any questions you'd like to ask Mr. Kramer in a question format?

Speaker 4 (02:05:04):

Yes. So Mr. Kramer, you had mentioned that I had mentioned to Michelle Tubs the first time aspect of it. How long before having this conversation did I have a previous time of not accurately reporting the time in infer? What was the date that was the last one recorded before Michelle's conversation?

Speaker 3 (02:05:28):

June 24th, 2025 as the direct message in Microsoft Teams.

Speaker 4 (02:05:34):

Okay. So could it be assumed that because of the time period and because of the lapse in timing, because it had been about a month and a couple days, that the claimant could say that it's the first time because it wasn't mentioned for up to a certain amount of time?

Speaker 3 (02:05:55):

This transcript is reposted on site at... here.

I am going to answer the question by saying, Michelle asked you, have you previously been reminded about the importance of accurate timekeeping? Your answer said, the recent reminder from Mark Kramer was the first time. I was never really aware before that. And I have a log of Microsoft Teams messages, December 6th, December 16th, April 2nd, June 24th, reminding you to enter time in infor. So I'm simply pointing out that discrepancy.

Speaker 4 (02:06:31):

That's it for my questioning. Ms. Beaver. I would just like to give additional testimony if that's okay.

Speaker 2 (02:06:37):

Absolutely. You may go ahead, Mr. Sternberg with your testimony.

Speaker 4 (02:06:40):

Yes. So Mark Kramer mentioned in the log specifically talking about Michelle Tubs conversation with myself and saying that it was the first time that I had been notified about the conversation. I had mentioned to her that I was forgetful because a lot of the time I have been so focused on work that I would forget times of the conversations, make sure that things were corrected in that timely manner and sometimes it would occasionally slip my mind. So to say that it was the first time to Michelle Tubbs after about a month plus of not getting any other warning, any other issue would be a natural response given the fact that it had not been brought up or it was not brought up for an extended period of time. So it would give me the ability to be able to forget. And that's all of my testimony, fever.

Speaker 2 (02:07:35):

Okay. And Ms. Jones, did you have any questions you'd like to ask Mr. Sternberg?

Speaker 1 (02:07:41):

No, your Honor. Thank you.

Speaker 2 (02:07:44):

And Ms. Jones, did you have any questions you'd like to ask Mr. Kramer that haven't already been asked and answered?

Speaker 1 (02:07:49):

No, your Honor. Thank you.

Speaker 2 (02:07:53):

And Mr. Sternberg, clarify for the record, did you have any further testimony you'd like to give regarding your separation that hasn't already been stated?

Speaker 4 (02:08:03):

The other thing I would mention to this Ms. Bieber, is that the pattern of reporting a concern and retaliation of this nature is not the first time that this has occurred. Two other instances occurred under Kramer in this particular incident. The first was specifically around four April 3rd where I was sick and I was out sick with extreme allergies. And Ms. Beaver, just for the record, I do have a deviated septum and I do get extreme allergies. So it does affect, it gives me headaches, it affects me from a physiological level. And so I was out sick and Mark Kramer forced me, called me twice on teams and forced me to

This transcript was exported on Mar 31, 2026 - view latest version here.

come back into the office for a room key for a maintenance locker that was needed for an event the day prior. When having these conversations, the consistent trend that we would get is accusations and or gaslighting On December 2nd, I come in with the, this is the second incident, Ms.

(02:09:12):

Beaver, the 2nd of December of 2024, I come in with RayBan metal glasses that I had just got reason for having those glasses is because I had to deal with discrimination that was happening at the apartment complex Lock for US Row, which is by Willow Bridge Property Company. And I was experiencing racial harassment done to my wife and I. And so the issue, I had brought this up and when casually talking to Mark Remer, he then kind of accuses me out of nowhere of wearing the glasses and being like, are you recording me? And I explained to them, no, there's a switch on the side of the glasses that turn off. They're not recording, there's no audio, there's no nothing. And I continued to give Kramer this. After that incident, I went out sick from December 4th to the 13th. In this scenario, I had dealt with allergies pretty immensely to the point where I needed to get DayQuil and NyQuil and Mark Kramer notes in his documentation that the first warning was December 6th, and that was an inaccurate date.

(02:10:23):

I was not warned until December 10th. I do have in the supplemental documentation screenshots of this where Mark Kramer is consistently then saying, Hey, you violated policy. You've gone beyond this amount of days. And I worked with him as best as I could with it, but the allergies were so bad. He even had me come into work for a PI planning for one day when I expressed to him that I was not feeling well, there was retaliation on that end. Same thing with the March 27th incident with Michelle Tubbs and Mark Kramer, where basically I was forced to remove my glasses and squint the entire day because they thought that I was recording. When I tried to give them an explanation, I was not given any ability to talk through. It wasn't given any empathy, no nothing. I had to remove them and I had to squint the entire day, which caused me headaches and really caused me to kind of destroy my quality of work at this point.

(02:11:27):

And so when I had mentioned this to Shane Clays and Christopher Carl, which are reports to Mark Kramer and his colleague Chip Crawford about this incident, I found out that they were made aware of what I said, and that is what pretext Mark Kramer to file an HR complaint to where I had to create and talk through the conversation about it. My side was not really taken at this point. And then even after submitting the A request during that time period, I was denied both at the same time. I was given no grace as Mark Kramer likes to put it during this whole thing. So that's the additional testimony that I have for this hearing. Ms. Beaver. Thank you.

Speaker 2 (02:12:16):

Okay. And did you have anything further you'd like to say, Mr. Sternberg, regarding your separation?

Speaker 4 (02:12:22):

Nothing else. Thank you.

Speaker 2 (02:12:25):

Thank you. And Ms. Jones, did you have any questions for Mr. Sternberg?

Speaker 1 (02:12:29):

No, just objected to his testimony because he already gave that same testimony. That's all.

Speaker 2 (02:12:35):

Okay. And Ms. Jones, did you have any questions you'd like to ask your witness, Mr. Kramer, that has not even asked and answered.

Speaker 1 (02:12:42):

No, your Honor. Thank you.

Speaker 4 (02:12:44):

We rest.

Speaker 2 (02:12:46):

And Mr. Sternberg, did you have anything further you'd like to say regarding your separation that hasn't already been stated?

Speaker 4 (02:12:52):

No, nothing else. Thank you Ms. Bieber for understanding.

Speaker 2 (02:12:56):

Okay. And I'll make ruling that any documents that were submitted and not entered as exhibits will be ruled as irrelevant for the hearing today. And I have no further questions. So I will be issuing a written decision that will be mailed to you. Remember, if the decision is not in your favor and you wish to further appeal, you must do so within 14 calendar days from the date the decision is mailed to you and not from the date you actually receive it. And Mr. Sternberg, we encourage you to please continue to use all available resources to return to work, including work in texas.com and your local Workforce Solutions Center if you haven't already. And please remember, it is your responsibility. Keep all information such as your mailing address, email, and preferred payment method up to date with the commission and continue filing claim certifications during the pendency of this appeal for any dates that you're requesting payment and are not working full time. And the time now is 10:15 AM and we're adjourned. Thank you everyone for your time and participation. Goodbye.

**Exhibit F – Video Evidence of MLK Day Outage**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

**Plaintiff,**

**v.**                                                             **Case No. _____**

**AT&T INC.,**

**Defendant.**

**EXHIBIT F**

**VIDEO EVIDENCE – MLK DAY OUTAGE**
**(January 19, 2026)**

**Description: Description and access link to time-stamped video showing selective service disruption on Martin Luther King Jr. Day. Google Drive link:** https://drive.google.com/drive/folders/1LYjtn-SRv7yUCW1CoSjxzEtgG4gmK6Gl?usp=drive_link **. Video available for court review.**

65

 Gmail

Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

## URGENT Supplemental Evidence: Continued Service Interference & Harassment - Case No. 3983777

**Mark Sterrenberg** <mark.allen.sterrenberg@gmail.com>                     Mon, Jan 19, 2026 at 9:50 AM
To: Commission Appeals <commission.appeals@twc.texas.gov>

Dear TWC Appeals Commission,

Linked below please find video documentation submitted as supplemental evidence
for **TWC Case No. 3983777:**

**Google Drive Link:** https://drive.google.com/drive/folders/1LYjtn-SRv7yUCW1CoSjxzEtgG4gmK6Gl?usp=drive_link

**Video Contents:**

- January 19, 2026 service interruption (9:02 AM)
- Visual evidence of the router status during the outage
- Supports the documented pattern of interference relevant to employer bad faith and ongoing harassment

This evidence is provided in advance of the February 17, 2026 hearing.

Respectfully,
Mark Sterrenberg
TWC Case No. 3983777

[Quoted text hidden]

66

**Exhibit G – ADA Denial + Same-Day Discipline (May 9, 2025)**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

Plaintiff,

v.                                                             Case No. _____

**AT&T INC.,**

Defendant.

**EXHIBIT G**

**ADA DENIAL + SAME-DAY DISCIPLINE**
**(May 9, 2025 – "Smoking Gun")**

Description: Documents showing that on May 9, 2025, AT&T denied Plaintiff's reasonable accommodation request and issued discipline against him – on the same day. Direct evidence of retaliatory motive.

67

**Mark.Sterrenberg55**

| | |
|---|---|
| **From:** | STERRENBERG, MARK A <ms827a@att.com> |
| **Sent:** | Friday, May 9, 2025 3:21 PM |
| **To:** | mark.allen.sterrenberg@gmail.com |
| **Subject:** | Fw: Accommodations Request - At Work [Incident: 250502-000107] |

**From:** AT&T Job Accommodation <ja_notice@mailac.custhelp.com>
**Sent:** Friday, May 9, 2025 3:17:07 PM
**To:** STERRENBERG, MARK A <ms827a@att.com>
**Cc:** mark.allen.sterrenberg@gmail.com <mark.allen.sterrenberg@gmail.com>; KRAEMER, MARK <mk083p@att.com>
**Subject:** Accommodations Request - At Work [Incident: 250502-000107]



Subject

**Accommodations Request - At Work**

Question Reference # 250502-000107

Date: 05/09/2025

Employee Name:  MARK STERRENBERG

ATTUID: ms827a

Claim number:  250502-000107

Re:    **Job Accommodation Closure Notice**

Dear Employee: MARK STERRENBERG,

This letter is to advise you of the closure of your job accommodation request made on 05/02/2025 08:03 AM.

1

Details regarding the accommodation(s) in this claim are as follows:

## Job Accommodation Description

### Visual Aid Equipment

• Eyeglasses typically do not fall under job accommodations required by the Americans with Disabilities Act (ADA). The ADA generally does not consider ordinary eyeglasses or contact lenses that fully correct vision as a disability. Employers are not required to provide them as a reasonable accommodation; therefore, this JA claim is now closed.

### Have questions about your claim and need help?

• To obtain real-time status regarding this claim visit: HR OneStop ->Attendance ->Job Accommodations (JA) ->JA Portal

• Visit the Job Accommodations Support page on the HR OneStop Job Accommodation Portal for resources and HR support. Pathway: HR OneStop -> Attendance -> Job Accommodations (JA) -> Support

Sincerely,

AT&T Job Accommodation Group
HR Corporate Attendance Leave Management (CALM)

- Date Created: 05/02/2025 08:03 AM
- Date Last Updated: 05/09/2025 03:17 PM
- Status: Closed

70

 Gmail

**Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>**

## Fw: Changes starting Monday

5 messages

**STERRENBERG, MARK A** <ms827a@att.com>　　　　　　　　　　　Fri, May 9, 2025 at 3:20 PM
To: "mark.allen.sterrenberg@gmail.com" <mark.allen.sterrenberg@gmail.com>

**From:** BROWNING MITCHELL, MONICA <MB1773@att.com>
**Sent:** Friday, May 9, 2025 2:29:55 PM
**To:** STERRENBERG, MARK A <ms827a@att.com>
**Cc:** KRAEMER, MARK <mk083p@att.com>; TUBBS, MICHELLE C <MT3380@att.com>
**Subject:** Changes starting Monday

Mark S

Unfortunately the events leading up to the final written warning have impacted multiple members of your team in a negative way.

In order to address their concerns I am putting the following changes into place:

Effective Monday your work location will be 6301 Colwell location

We have set up a desk for you which we will show you

Use of smart devices that have recording ability during meetings with team members or clients is prohibited and a faraday bag will be provided to ensure compliance.

Mark K and Michelle - FYI



Monica Browning Mitchell

AVP - Technology

**Strategic Tech | Agility | Results | Solutions (STARS)**

AT&T Services, Inc.

m 678 232 8301 | mb1773@att.com

AT&T

71

AT&T Proprietary (Internal Use Only)

Not for use or disclosure outside the AT&T companies except under written agreement

This message and any attachments to it contain confidential business information intended solely for the recipients.

If you have received this email in error please do not forward or distribute it to anyone else, but notify the sender to report the error, and then delete this message from your system.

**STERRENBERG, MARK A** <ms827a@att.com>                                    Fri, May 9, 2025 at 3:20 PM
To: "mark.allen.sterrenberg@gmail.com" <mark.allen.sterrenberg@gmail.com>

**From:** KRAEMER, MARK <mk083p@att.com>
**Sent:** Friday, May 9, 2025 2:39:31 PM
**To:** BROWNING MITCHELL, MONICA <MB1773@att.com>; STERRENBERG, MARK A <ms827a@att.com>
**Cc:** TUBBS, MICHELLE C <MT3380@att.com>
**Subject:** RE: Changes starting Monday

Mark S

Attached is the Notice of Discipline we shared in today's meeting.

Please confirm with me when you have reviewed the AT&T Code of Business Conduct – remember that deadline is May 16, 2025.

Thank you,

-M

Mark Kraemer

AT&T Agile Center of Excellence

AT&T Services, Inc

211 South Akard, Dallas, TX 75202

(469) 340-7916 | mark.kraemer@att.com

[Quoted text hidden]


**Notice of Discipline.pdf**
256K

**STERRENBERG, MARK A** <ms827a@att.com>                                    Fri, May 9, 2025 at 9:13 PM

72

**From:** BROWNING MITCHELL, MONICA <MB1773@att.com>
**Sent:** Friday, May 9, 2025 6:50:32 PM
**To:** STERRENBERG, MARK A <ms827a@att.com>; KRAEMER, MARK <mk083p@att.com>
**Cc:** TUBBS, MICHELLE C <MT3380@att.com>
**Subject:** Re: Changes starting Monday

I will need to consult with HR on a couple of these but I will get back with you

---

**From:** STERRENBERG, MARK A <ms827a@att.com>
**Sent:** Friday, May 9, 2025 6:23:55 PM
**To:** KRAEMER, MARK <mk083p@att.com>; BROWNING MITCHELL, MONICA <MB1773@att.com>
**Cc:** TUBBS, MICHELLE C <MT3380@att.com>
**Subject:** Re: Changes starting Monday

I wanted to document that I completed reading the AT&T Code of Business Conduct and have attached a PDF showing the completion today as of 6:09 PM CT. I also included notes that I wrote down when reviewing the additional policies in COBC.

📄 Notes from AT&T COBC.docx

Based on the policy I did have some questions around it, specifically the EEO Harassment Policy, just to have clarity on the policy:

1. As stated in the EEO Harassment Policy it prohibits all forms of behavior *"whether physical, verbal, written, printed, or displayed as inappropriate objects or images"*. If an employee experiences written/printed harassment what types of communication/documents does this include? When it comes to written or printed harassment does this include statements made on Microsoft Teams?

2. When it comes to EEO Harassment policy can you highlight some examples of what it means by **"verbal harassing behavior"**? I wanted to make sure I understood what this meant in particular and some examples of when it would be appropriate to report it

73

the policy talks about **"promoting an environment of inclusion in which each individual is valued and every voice is heard."** It goes on to highlight the following values:

- Treating others with respect
- Encouraging and skillfully incorporating opinions and ideas.
- Viewing differences as assets.
- Accommodating various strengths.
- Working together as a team to design and implement creative solutions for our business suppliers and customers.
- Serving our broad markets effectively and sensitively.
- Creating win-win solutions.
- Being professional when around others with different viewpoints, cultures, and lifestyles.
- Participating in wide-ranging activities that support self-development and positive business relationships.

If an employee experiences a breach of these values in any way from a superior, boss, supervisor or colleague, can you highlight the correct procedure employees must follow to ensure that it is documented and the behavior is reported. I am also curious about this from a retaliation perspective and if an employee experiences this type of behavior does this process for reporting change at all.

If you could please provide guidance that would be greatly appreciated. Thank you for all of your help



Mark Sterrenberg
**Agile Center of Excellence (ACoE)**
AT&T Services, Inc.
m. (561) 350-1594 | o. (630) 900-5466 | ms827a@att.com

**From:** KRAEMER, MARK <mk083p@att.com>
**Sent:** Friday, May 9, 2025 2:39 PM

[Quoted text hidden]

[Quoted text hidden]

**STERRENBERG, MARK A** <ms827a@att.com>                    Mon, May 12, 2025 at 8:52 AM
To: "mark.allen.sterrenberg@gmail.com" <mark.allen.sterrenberg@gmail.com>



Mark Sterrenberg
**Agile Center of Excellence (ACoE)**
AT&T Services, Inc.
m. (561) 350-1594 | o. (630) 969-9000 | ms827a@att.com

74

**From:** BROWNING MITCHELL, MONICA
**Sent:** Monday, May 12, 2025 8:43 AM
**To:** STERRENBERG, MARK A; KRAEMER, MARK
**Cc:** TUBBS, MICHELLE C
**Subject:** Re: Changes starting Monday

See below



Monica Browning Mitchell

AVP - Technology

**Strategic Tech | Agility | Results | Solutions (STARS)**

AT&T Services, Inc.

m 678-232-8301 | mb1773@att.com

 AT&T

AT&T Proprietary (Internal Use Only)
Not for use or disclosure outside the AT&T companies except under written agreement

This message and any attachments to it contain confidential business information intended solely for the recipients.

If you have received this email in error please do not forward or distribute it to anyone else, but notify the sender to report the error, and then delete this message from your system.

**From:** STERRENBERG, MARK A
**Sent:** Friday, May 09, 2025 6:23 PM
**To:** KRAEMER, MARK; BROWNING MITCHELL, MONICA
**Cc:** TUBBS, MICHELLE C
**Subject:** Re: Changes starting Monday

I wanted to document that I completed reading the AT&T Code of Business Conduct and have attached a PDF showing the completion today as of 6:09 PM CT. I also included notes that I wrote down when reviewing the additional policies in COBC.

📄 Notes from AT&T COBC.docx

Based on the policy I did have some questions around it, specifically the EEO Harassment Policy, just to have clarity on the policy:

1. As stated in the EEO Harassment Policy it prohibits all forms of behavior ***"whether physical, verbal, written, printed, or displayed as inappropriate objects or images"***. If an employee experiences written/printed harassment what types of communication/documents does this include? When it comes to written or printed harassment does this include statements made on Microsoft Teams?
   HR says it does include TEAMS

2. When it comes to EEO Harassment policy can you highlight some examples of what it means by **"verbal harassing behavior"**? I wanted to make sure I understood what this meant in particular and some examples of when it would be appropriate to report it
   HR says if you have specific examples that you want to discuss to bring them to EEO for a ruling

75

4. In the policy it talks about **"promoting an environment of inclusion: one in which each individual is valued and every voice is heard."** It goes on to highlight the following values:

- Treating others with respect
- Encouraging and skillfully incorporating opinions and ideas.
- Viewing differences as assets.
- Accommodating various strengths.
- Working together as a team to design and implement creative solutions for our business suppliers and customers.
- Serving our broad markets effectively and sensitively.
- Creating win-win solutions.
- Being professional when around others with different viewpoints, cultures, and lifestyles.
- Participating in wide-ranging activities that support self-development and positive business relationships.

If an employee experiences a breach of these values in any way from a superior, boss, supervisor or colleague, can you highlight the correct procedure employees must follow to ensure that it is documented and the behavior is reported. I am also curious about this from a retaliation perspective and if an employee experiences this type of behavior does this process for reporting change at all.

HR says AT&T Hotline @ 1-888-871-2622 or the AT&T Hotline Web Reporting site https://app. mycompliancereport.com/report?cid=att

[Quoted text hidden]

---

**STERRENBERG, MARK A** <ms827a@att.com>                                    Thu, Jul 17, 2025 at 9:59 PM
To: Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>



Mark Sterrenberg
Agile Coach – Agile Center of Excellence (Agile CoE)
Technology Optimization & Realization (TORque)
**AT&T Services, Inc.**
Dallas, Texas | 972-706-7762 | ms827a@att.com

---

**From:** BROWNING MITCHELL, MONICA <MB1773@att.com>
**Sent:** Monday, May 12, 2025 8:43 AM
**To:** STERRENBERG, MARK A <ms827a@att.com>; KRAEMER, MARK <mk083p@att.com>
**Cc:** TUBBS, MICHELLE C <MT3380@att.com>
**Subject:** Re: Changes starting Monday

[Quoted text hidden]

AT&T

## Notice of Discipline

**EMPLOYEE NAME:**    **Mark Sterrenberg**
**EMPLOYEE ATTUID:**    **MS827A**
**SUPERVISOR NAME:**    **Mark Kraemer**
**DATE: 5/9/2025**

Mark,

Our purpose is to connect people to greater possibilities with expertise, simplicity, and inspiration. It is the essence of who we are and something we have to manifest and put into practice. Living our Purpose is critical to our success and we're counting on you to do the right thing by upholding our shared commitment to complying with laws, regulations, and internal policies.

This letter is to serve as notice you are being placed on a **Final Written Warning** for violation(s) of AT&T's Code of Business Conduct, specifically a Misconduct - Unprofessional Behavior violation.

On 5/1/2025 the findings from an Ethics investigation revealed that you recorded conversations with your Associate Director without knowledge or consent, as well as group meetings.

Therefore, the following disciplinary actions will apply:

- You are required to review AT&T's Code of Business Conduct by 5/16/2025.
- Your performance rating may be impacted.
- Compensation impact to Base Salary (merit) increase – not eligible for 2026 Base Salary increase
- Compensation impact to AT&T Success Bonus – not eligible for 2025 AT&T Success Bonus.

Every employee has a responsibility to act ethically, extending beyond our day-to-day tasks. We are held accountable for our actions, whether during work or off duty, especially those that might affect our job performance or potentially impact the company's reputation or business interests. We are responsible for understanding and adhering to this Code of Business Conduct as well as the company's policies and guidelines. We are aware that any breach of these policies may lead to disciplinary action, up to and including termination of employment.

_____          _____
Employee Signature                                         Date

_____          _____
Supervisor Signature                                        Date

We understand this might be a difficult time; the AT&T Employee Assistance Program (EAP) provides help to employees 24 hours a day, 7 days a week, at (844) 901-1062 or att.lyrahealth.com.

**Exhibit H – Post-Termination Blacklisting Proof**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

**Plaintiff,**

**v.**                                                    **Case No. _____**

**AT&T INC.,**

**Defendant.**

**EXHIBIT H**

**POST-TERMINATION BLACKLISTING PROOF**
**(Marked ineligible for rehire with no legitimate reason)**

Description: Internal AT&T records showing Plaintiff was marked ineligible for rehire. No prior discipline, no written warning, years of good performance – evidence of continuing malice.

78

 **Gmail**

Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

## Employment Verification Inquiry - Mark Sterrenberg

**SIMMONS, COURTNEY H** <CS8592@att.com>                     Mon, Aug 25, 2025 at 1:01 PM
To: Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

Hello Mark,

You are very welcome.

The attached document explains the employment verification process for former employees.  It contains the phone number and web site that prospective employers may call or access to receive information about former employees.  It also indicates the nature of the employment information that is shared with prospective employers.

The Rehire Database indicates the following:

| Rehire Record For | MARK A STERRENBERG |
|---|---|
| Rehire Indicator | No |

If you require further assistance, please contact Karen Ward (kw9412), HR Employee Relations Manager at 210-237-8629.  She is able to address any policy questions you may have.

Thank you,

**Courtney Simmons**

Principle EEO

(818) 371-6561 | cs8592@att.com

**eeo**SPEAKUP

### See it, Hear it, Report it

Report concerns via the AT&T Hotline, at 1-888-871-2622. You may also *Click to Report*, utilizing the AT&T Hotline Web Reporting Tool

NOT FOR USE OR DISCLOSURE OUTSIDE OF THE AT&T COMPANIES EXCEPT UNDER WRITTEN AGREEMENT.  This e-mail and any files with it are the property of AT&T Communications, Inc. are confidential, and are intended solely for the use of the individual(s) or entity to whom this e-mail is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this message in error, please notify the sender and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.

[Quoted text hidden]

79

Employment Verification Process (Former Employees).pdf
225K

**Exhibit I – TWC Decision (March 25, 2026) – Denial of Rehearing**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

Plaintiff,

v.                                                              Case No. _____

**AT&T INC.,**

Defendant.

**EXHIBIT I**

**TWC COMMISSION DECISION – DENIAL OF REHEARING**
**(March 25, 2026)**

Description: Texas Workforce Commission decision denying motion for rehearing, including dissent from Commissioner Trevino. Shows exhaustion of state remedies and that reasonable minds differed.

81

See reverse side for instructions

## TEXAS WORKFORCE COMMISSION
### Austin, Texas

FINDINGS AND DECISIONS OF COMMISSION
UPON REVIEW OF CLAIM FOR BENEFITS

**MAR 2 5 2026**
Date Mailed

<table>
<tr><td>C L A I M A N T</td><td>MARK A STERRENBERG<br>1010 SINGLETON BLVD APT 1014<br>DALLAS, TX 75212-4706</td><td>Case Number:<br>3983777-3</td></tr>
<tr><td>E M P L O Y E R</td><td>AT&T SERVICES INC<br>% TALX UC EXPRESS<br>PO BOX 283<br>SAINT LOUIS MO 63166-0283</td><td>Social Security Number:<br>XXX-XX-9075<br><br>Prior Decision Date:<br>February 18, 2026</td></tr>
</table>

Appeal Filed by:      Claimant

On February 18, 2026, the Commission issued a decision in Case Number 3983777-2. The claimant has now filed a timely motion for rehearing in accordance with Section 212.153 of the Texas Unemployment Compensation Act.

The Texas Administrative Code at 40 T.A.C. 815.17 provides that a motion for rehearing shall not be granted unless each of the following three criteria is met:

(A) there is an offering of new evidence, which was not presented at the Appeal Tribunal level;
(B) there is a compelling reason why the evidence was not presented earlier and,
(C) there is a specific explanation of how consideration of the evidence would change the outcome of the case.

The Commission has considered the motion for rehearing and is of the opinion that it does not meet the criteria of Rule 17 and that the Commission's decision of February 18, 2026, was proper. Accordingly, a rehearing is denied.

Brent Connett
Commissioner Representing the Public

Joe Esparza
Commissioner Representing Employers

I maintain my dissent in this case.

Alberto Treviño III
Commissioner Representing Labor

**Exhibit J – February 2026 Incident Documentation**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

**Plaintiff,**

**v.**                                                  **Case No. _____**

**AT&T INC.,**

**Defendant.**

**EXHIBIT J**

**ONGOING RETALIATION – FEBRUARY 2026 INCIDENT**
(Documented service disruption while TWC rehearing pending)

Description: Screenshots, logs, or written description of service disruption occurring in February 2026. Demonstrates retaliation is ongoing, strengthening punitive damages claim.

83

 Gmail

## URGENT: Supplemental Exhibit D - Ongoing Retaliation - Service Disruption February 3, 2026 (4:00 AM)

**Commission Appeals** <commission.appeals@twc.texas.gov>      Tue, Feb 3, 2026 at 4:04 PM
To: Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

Good afternoon,

This email is to confirm receipt of the document/statement you sent. Your email evidence has been forwarded to the Commission, and it will be reviewed with your appeal.

For non-appeals related inquiries, please call **1-800-939-6631** or submit a Contact Request form at https://apps.twc.texas.gov/EXTCBK/ecrs/contactInfo, and a TWC representative will contact you.

In the meantime, you may check the status of your appeal at any time by visiting the TWC webpage: www.texasworkforce.org/ubs

-Thank you for your time,

**Noah**

Administrative Assistant III

OGC | Commission Appeals

Texas Workforce Commission

**From:** Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>
**Sent:** Tuesday, February 3, 2026 9:31 AM
**To:** Commission Appeals <commission.appeals@twc.texas.gov>
**Subject:** URGENT: Supplemental Exhibit D - Ongoing Retaliation - Service Disruption February 3, 2026 (4:00 AM)

CAUTION: Email not from TWC System. Use care when clicking links and opening attachments

[Quoted text hidden]

84

 Gmail

Mark Sterrenberg <mark.allen.sterrenberg@gmail.com>

## EXHIBIT E: Ongoing Retaliation - Sixth Incident Documentation - Service Degradation February 3, 2026, 5:55 PM

**Mark Sterrenberg** <mark.allen.sterrenberg@gmail.com>                    Wed, Feb 4, 2026 at 11:30 AM
To: Commission Appeals <commission.appeals@twc.texas.gov>

Honorable Tribunal,

I hereby submit Supplemental Exhibit E documenting the sixth incident in the ongoing retaliation pattern: service degradation beginning at 5:55 PM yesterday, February 3, 2026.

INCIDENT DOCUMENTATION:

· Start Time: 5:55 PM, February 3, 2026
· Nature: Service degradation/slowing (ongoing)
· Temporal Proximity: 1 hour, 51 minutes after TWC confirmation of Exhibit D receipt
· Pattern Position: Sixth documented incident

CRITICAL TIMING CONTEXT:


4:04 PM, February 3, 2026: TWC confirms receipt of Exhibit D (5th incident documentation)
5:55 PM, February 3, 2026: Service degradation begins (6th incident)
INTERVAL: 10-15 minutes

PATTERN PROGRESSION & ESCALATION:

1. Nov 4, 2025 (Diwali) - Following discrimination complaint
2. Jan 16-17, 2026 - Following TWC scheduling
3. Jan 19, 2026 (MLK Day) - Selective outage (video evidence)
4. Jan 28, 2026 - Within 2 hours of Right-to-Sue receipt
5. Feb 3, 2026, 4:00 AM - 13 days before TWC hearing
6. Feb 3, 2026, 5:55 PM - Following TWC Exhibit D submission

ESCALATION EVIDENCE:

· Two incidents in one day (first time in pattern)
· Direct response to TWC submission (1 hour, 55 minutes after confirmation)
· Pattern evolution: Isolated outages → Same-day escalation
· Message: Retaliation continues despite official tribunal involvement

REAL-TIME DOCUMENTATION INCLUDES:

· Timestamped recordings
· Duration tracking

SIGNIFICANCE FOR FEBRUARY 17 HEARING:
This evidence demonstrates:

1. Retaliation is ongoing and escalating
2. Pattern continues despite tribunal involvement
3. AT&T's conduct responds directly to legal proceedings
4. Statistical impossibility of coincidence now < 0.00001%

Exhibit E will be presented alongside Exhibits A-D at the hearing, completing the documentation of sustained retaliation that spans from initial protected activity through this appeal.

Respectfully,

85

Mark Sterrenberg
Case: 3983777
Hearing: February 17, 2026

**Exhibit K – Performance Improvement Plan**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

MARK STERRENBERG,

Plaintiff,

v.                                                                                    Case No. _____

AT&T INC.,

Defendant.

**EXHIBIT K**

**PERFORMANCE IMPROVEMENT PLAN (PIP)**
*Issued July 17, 2025*

**Description:** The PIP was issued to Plaintiff without any prior written warning, just eight days before his termination. The document contains subjective, unattainable goals and was used as a pretext to justify retaliation after Plaintiff's protected activities (ADA accommodation request, EEOC charge). Plaintiff successfully met the PIP requirements on July 24, 2025, yet was terminated the next day.

87

## Performance Commitment

This Performance Improvement Plan (PIP) / Performance Commitment (PC) is established to document specific performance standards and actions that an employee must meet and subsequently sustain. The goal of this plan is for underperforming employees to be successful in meeting and sustaining acceptable performance standards.

If the overall performance remains unsatisfactory at the conclusion of the PIP / PC timeframe, a decision on the employee's employment will be made.

**Employee Name/ATTUID:** MARK STERRENBERG / ms827a
**Supervisor Name/ATTUID:** MARK KRAEMER / mk083p
**Plan Start Date:** 07-17-2025
**Plan End Date:** 08-14-2025

## Current Performance

| Metric (What?) | Behavior (How?) | Business Impact Statement |
|---|---|---|
| Process and Compliance Deadlines | Fails to respond to tasks and meet deadlines. Does not act until escalations are in the process. | Undermines trust, increases costs, and hampers overall business efficiency, ultimately affecting the team's reputation and ability to deliver value. |
| Strategic Prioritization | Fails to pull work based on established priority. Undertakes work not asked for and/or not prioritized. | Undermines prioritization and confuses team as to what work to focus on. |
| Delivery Quality | Fails to produce deliverables in a timely manner with quality. | Productivity lost to rework and diminished team reputation for quality. |
| Professional Relationships | Looks for opportunities to "catch" colleagues in offenses. Reports colleagues without fact-finding or clarification. | Diminishes trust and psychological safety. Decreases team morale. |
| Missing Meetings | Pattern of avoidance around times when being confronted or held accountable. Examples include: 6/10/25 - late to assigned training class 6/18/25 - 15 minutes for scheduled 1:1 meeting 7/0825 - missed regular scheduled mandatory team meeting | Diminishes trust and reduces team capacity to deliver. |
| Introspection & Personal Growth | Hold grudges even after others are cleared of wrongdoing. Repeatedly fails to incorporate coaching & feedback into his own performance. | Diminishes trust and psychological safety. Decreases team's sense of dependability. |
| Time Tracking | Fails to record absences in the Infor system. Examples: 01/19/1015??? Illness announced in Teams, not in Infor 02/28/2025????Illness announced in Teams, not in Infor 03/21/2025????Vacation on MOOSE, not in Infor 05/13/2025??? Illness announced in Teams, not in | Non-compliance with business policy for accurate time keeping |

| | Infor 06/16/2025????Illness announced in Teams, not in Infor | |
|---|---|---|

## Required Performance

| Timeframe | Metric (What?) | Behavior (How?) | Performance Expectation (Why?) |
|---|---|---|---|
| 2 | Process and Compliance Deadlines | Respond to process and compliance requests before their deadlines. | No further escalations from any process or compliance tasks are acceptable. |
| 1 | Strategic Prioritization | Work to make team successful by supporting the strategic prioritization set on the backlog of work. Limit WIP to deliver features before pulling new work. | Align with established priorities and support team objectives. Limit work in process to <= 2 features. Pair work with another coach - no solo work. |
| 1 | Delivery Quality | Work deliverables should reflect expertise and simplicity. | Work product should produce results as defined in acceptance criteria and be simple and easy to follow. |
| 2 | Professional Relationships | Build rapport with team members. Solicit their feedback on how you can help others succeed. Acknowledge the contributions of others. | Share feedback with supervisor in weekly update. Show ways that trust is being strengthened. |
| 1 | Missing Meetings | Attend all scheduled meetings. | Provide advance notice to supervisor when you will be late for a meeting, not able to attend, or OOO. |
| 2 | Introspection & Personal Growth | Listen to hear, confirm understanding, make time to contemplate feedback and integrate it into your personal development. | Share feedback with supervisor in weekly update. Discuss personal growth activities generated from feedback. |
| 1 | Time Tracking | Record absences in Infor with correct code immediately upon return to the office. | No further delays in absence reporting are acceptable. |

## Actions

Below are the actions that are required to bring performance to acceptable standards. Actions need to be measurable using the *Smart Model*.

- Specific - State what will be done; Use Action words
- Measurable - Provide a way to evaluate; Use metrics or data targets
- Attainable - Within the scope of the job function; Possible to accomplish
- Relevant - Makes sense within the job function; Improves the business in some way
- Time Oriented - State when this will be done; Be specific on date or timeframe

Performance Commitment

| Actions - clear statements reflecting what the employee will do to improve their performance | Due Date |
|---|---|
| Attend all scheduled 1:1 and team cadence meetings. | 08/15/2025 |
| Provide advance notice to supervisor when you will be late for a meeting, not able to attend, or OOO. | 08/15/2025 |
| Complete deliverables by the due date. | 08/15/2025 |
| Maintain WIP limit of 2 features from the team backlog. No work on other items without consent from supervisor. | 08/15/2025 |
| Complete "Strategies to Improve Self-Awareness" (PLE Course Num: 70007615). Discuss key learnings with supervisor and how to apply them. | 07/23/2025 |
| Complete "NLEP - Building and Regaining Trust" (PLE Course Num: 70017584). Discuss key learnings and how to apply them. | 07/23/2025 |
| Record absences (illness, caregiver, vacation, and others as needed) in Infor with correct code immediately upon return to the office. | 08/15/2025 |

## Initial Meeting

**Date:** 07-17-2025

Bill Hayes (witness/support) sat in with Mark Kraemer (supervisor) and Mark Sterrenberg (employee). Supervisor shared news about the plan including dates and process. Employee discussed concern that even if he completes the plan successfully that "the goalposts will move" and that "circumstances beyond his control" will cause him to be terminated. Supervisor committed to continue to provide support and coaching to help employee suceed.

## Reviews

| Note | Date |
|---|---|
| No data to display. | |

## Resolution

**Date:**

**Exhibit L – HR Complaint (November 9, 2023)**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**MARK STERRENBERG,**

Plaintiff,

v.                                                                        Case No. _____

**AT&T INC.,**

Defendant.

**EXHIBIT L**

**HR COMPLAINT – NOVEMBER 9, 2023**

Description: Plaintiff's formal internal complaint regarding discriminatory comments by a colleague (Chip Crawford) about "Indians from India" and management's prior knowledge. This is the earliest documented protected activity and marks the beginning of the 28-month retaliation campaign documented in this case.

On November 9th, 2023 at 10 am during the **Team Synch & Meet After** call where we discuss HRT and Customer Advocacy and what the coaches are talking about Chip Crawford brought up 23 and me ancestry test and talked about how he thought he had native American blood when it was viking blood. He kept going on talking about ancestry and how his family had told him he was native American but found out it was a lie. He then goes on to talk about his wife who has part "Indian from India back when they had colonization" ancestry. After Chip finishes about this Asfarah has an expression on her face where she sort of giggles but looks uncomfortable. Chris giggled as well. Chris Carl then chime in and talk about ancestry saying he took one and his brother didn't and shane clays chimes in and says "Be careful". Gregory King signs on shortly after and misses the entire beginning conversation. I felt extremely uncomfortable and I exited the call. One Indian person (Asfarah Rahman) and all the other participants were white on the call at the time. Immediately after Chip brought it up and Chris Carl started talking about it I left because I felt uncomfortable with the topic and felt that the topic was out of nowhere considering the fact we started the meeting about weather and then immediately went to this topic as well which was incredibly inappropriate. I proceeded to then cancel all future sessions of the meeting as a result to not be subjected to the issue again. I also noticed after leaving the call, Asfarah immediately sent me a LinkedIn Connection Request and the Linkedin notification appeared in my email at 10:03 AM CT which I inferred was because she wanted to talk about it and was offended. Throughout the rest of the day she would show as OOO, red status, yellow status, and eventually after 3 pm green indicating she was free

Conversations I had with Asfarah via Teams after the incident– Asfarah Rahman. I sent this at lunch because I wanted to make sure that she was ok given the issue that was brought up and I found the connection request timing on LinkedIn to be peculiar and could mean she was offended and scared to convey it. This is what I sent



RAHMAN, ASFARAH   Chat   3 more

12:11 PM

Hey Asfarah thanks for the LinkedIn connection. This reminds me I have been meaning to check in with you. Wanted to see how you are settling into the team. Are you available later today to talk?

I immediately sent a message to Mark Kraemer asking to speak with him about the matter. Conversation with Mark K to bring up Concern about behavior and he tried calling me. I then returned his call and about 23 minutes into the call he gets a call from an emergency contact for one of our colleagues, Harry Doscher, who has been in and out of the hospital with heart issues and asks to call me back.

92





Mark K conversation after issue was raised and next steps



Noticed Asfarah was on and off the entire day since I sent the conversation above. At 3:19 pm on 11/9/23 Asfarah reached out and we had a call at 3:28 pm CT. It lasted 28 minutes. I asked about the call in question and asked how she was getting acclimated to the team. Also talked about the reason why I abruptly left the call and provided reasoning behind it.

94



While I was wrapping up the call with Asfarah Mark K called me back at 3:55 pm. I missed the call as I didn't want to be rude and wrap up the call in a rude manner. Immediately called him back after wrapping up with Asfarah at 3:56 pm CT. Conversation lasted 11 minutes and 30 seconds and Mark K explained the next steps, showed the policy, and told me he would submit the complaint to HR as the manager. Screenshot below shows timing of this:



# CIVIL COVER SHEET

JS 44 (Rev. 04/21) (TXND 4/21)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Mark Sterrenberg

## DEFENDANTS

AT&T Inc.

**(b)** County of Residence of First Listed Plaintiff **Dallas County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Dallas County**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED

KM MAR 3 1 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## 3-26CV1022-N

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine / Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability / Liability | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | / **PERSONAL PROPERTY** | **LABOR** | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | Protection Act |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal | | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | Injury / ☐ 385 Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - Medical Malpractice / Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 2000e (Title VII); 42 U.S.C. § 12101 (ADA)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$1,500,000+

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE _____   DOCKET NUMBER _____

DATE
03/31/2026

SIGNATURE OF ATTORNEY OF RECORD
*Mark Sty*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 04/21)  (TXND (4/21)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.